# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1998-CA-01190-COA

**IN THE MATTER OF THE ESTATE OF MILTON TEMPLE, DECEASED:**
**EVELYN TEMPLE ADDINGTON**                                   **APPELLANT**

**v.**

**ESTATE OF MILTON TEMPLE, DECEASED AND EDWIN MARSHALL**
**TEMPLE**                                                    **APPELLEES**

| | |
|---|---|
| DATE OF TRIAL COURT JUDGMENT: | 5/18/1998 |
| TRIAL JUDGE: | HON. TIMOTHY E. ERVIN |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL B. GRATZ JR. |
| ATTORNEYS FOR APPELLEES: | JAMES HUGH RAY |
| | THOMAS WICKER |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| TRIAL COURT DISPOSITION: | CERTIFICATE OF DEPOSIT HELD TO PASS OUTSIDE THE ESTATE |
| DISPOSITION: | REVERSED AND REMANDED - 03/28/00 |
| MOTION FOR REHEARING FILED: | 4/11/2000; denied 5/30/2000 |
| CERTIORARI FILED: | 6/13/2000; granted 8/24/2000 |
| MANDATE ISSUED: | |

EN BANC:

SOUTHWICK, P.J., FOR THE COURT:

¶1. The Bank of Mississippi filed an interpleader for the purpose of determining ownership of a $50,000 certificate of deposit it had issued to Milton Temple, now deceased. The dueling claimants were Temple's estate on the one hand, and his sister, Evelyn Temple Addington, on the other. Following a hearing, the Lee County Chancery Court awarded the certificate of deposit to the Estate. Evelyn Addington appeals. We agree that the chancellor erred in relying solely upon the names that appeared on the certificate. We reverse and remand for further proceedings.

**FACTS**

¶2. Milton Temple and his wife, Clara, owned two certificates of deposit in joint tenancy with rights of survivorship. One certificate was in the amount of $90,000 and the second was for $50,000. The dispute here is over the ownership of the $50,000 certificate.

¶3. Milton Temple's wife Clara died in January 1992. Thus Milton Temple became the sole owner of both certificates under their respective survivorship clauses. The $50,000 certificate matured approximately one week after Mrs. Temple's death. The bank then automatically renewed it in the names of both Milton and Clara Temple.

¶4. The next month Milton Temple returned the $90,000 certificate to the bank and requested that the bank re-issue it in the names "Milton Temple or Evelyn Addington," the latter being his sister. After Temple and Addington completed the necessary forms, the bank re-issued the certificate as Temple had requested. No issue is made on appeal regarding the $90,000 certificate.

¶5. Apparently at the same time, Temple requested that the bank re-issue the $50,000 certificate to himself and his sister. It appears that all of the necessary paperwork was completed, but the original certificate was never returned to the bank. This may explain why ownership of that certificate was not changed. Temple died on September 6, 1996. Neither the Estate nor Addington was able to produce the original $50,000 certificate. A copy of the original was provided by the bank and was admitted into evidence at the hearing as a duplicate.

¶6. Addington argues that the signature card, computer maintenance records from the bank and testimony from Temple's niece and attorney, Arweeda Miller, showed that ownership of the certificate had been changed to both Temple and Addington. The chancellor disagreed.

## DISCUSSION

¶7. We will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.*, 716 So.2d 200, 204 (Miss. 1998). The chancellor found that "the law [does not] allow the Court to draft a certificate of deposit for Milton Temple, deceased."

¶8. The premise for that statement is that until the names on the original certificate of deposit were changed, they controlled. That is, the certificate itself is controlling. This would mean that the bank and Mr. Temple could not contractually agree that Mr. Temple's sister had a survivorship interest until the names were changed. We will examine that legal premise in some detail.

¶9. Testimony revealed that normally at this bank the face of a certificate was not initially changed. Instead, at some future date, such as at the time of a renewal of the certificate, a new one would be issued with the new names. The effect of the chancellor's view is that the bank's procedures were fatally flawed for every single certificate that was handled in that way. Whenever the owner of the certificate died before a new certificate was issued, a change to the survivorship interest that he or she had made as a result of meeting with a bank official and signing offered documents, availed the depositor nothing.

¶10. There is a certain initial reasonableness to the chancellor's exclusive reliance on the names on the certificate of deposit, at least until one contemplates that the law gives significance to some facial

designations of ownership and does not to others. The differences do not arise from arbitrariness in the law, but from the varying purposes for legal instruments. Our task is to determine into what category this non-negotiable note of the bank is to be placed.

¶11. For example, should the fact that an automobile has painted on its side the name of its owner mean that when the owner sells it the presumption remains that the name on the side nonetheless controls? Of course not, as automobile ownership is determined in a manner established by the statute regarding title certificates. Miss. Code Ann. § 63-21-19 (4) (Supp. 1999). Before one jumps to conclusions about the statute, we note that it makes the name on the title certificate only "prima facie" evidence. *Id.*

¶12. What the chancellor did not identify was any statute that describes the effect of the names on the certificate of deposit. We undertake the effort.

¶13. The certificate of deposit in question was acquired on July 13, 1991, was for an 180 day term, and was automatically renewed at each 180 day anniversary. The relevant versions of Article 3 of the Uniform Commercial Code are those that became effective January 1, 1993. 1992 Miss. Laws ch. 420, § 113. These revisions will be addressed below. The renewals after January 1, 1993 would be subject to the new statutes. The certificate at the time of Mr. Temple's death on September 6, 1996, would have had its most recent renewal in June 1996 and would therefore be controlled by the statutes that became effective in 1993.

¶14. A negotiable instrument has these statutory characteristics:

> an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
>
> (1) Is payable to bearer or order at the time it is issued or first comes into possession of a holder;
>
> (2) Is payable on demand or at a definite time; and
>
> (3) Does not state any other undertaking or instruction . . ..

Miss. Code Ann. § 75-3-104 (a) (Supp. 1999), as adopted in 1992 Miss. Laws ch. 420, § 4. Another section of the same statute provides that an instrument is not negotiable if "it contains a conspicuous statement . . . that the promise . . . is not negotiable . . . ." Miss. Code Ann. § 75-3-104 (d) (Supp. 1999). This certificate of deposit was marked on its face as "non-negotiable." Therefore this document could not be considered a negotiable instrument.

¶15. If this had been a negotiable instrument and the estate had been a holder in due course, the authorities concerning those matters might be relevant. Those rules in part were created to protect holders from having to concern themselves with the fact questions of ownership that apply to non-negotiable instruments. Miss. Code Ann. § 75-3-302 (Supp. 1999). The commercial need for the unimpeachable validity of the names on a negotiable instrument is absent. The law that has developed regarding non-negotiable instruments is applicable here.

¶16. The facts indicate that the names of Mr. Temple and his deceased wife likely continued to appear on the certificate itself, but the original had been lost. The facts also show that his late wife's name had been removed from everything else relating to this certificate. A signature card proved that after his wife's death

Mr. Temple attempted to have his sister made the co-owner. The account statement also named Mr. Temple and his sister as the owners. Testimony revealed that the bank did not require that the certificate itself be altered. In sum, there is evidence that the bank considered the sister to have the survivorship interest. The chancellor made no findings on this point.

¶17. Though the original certificate of deposit was lost, the copy retained by the bank indicated that no change on the face of the document had been made to reflect a new ownership. Adequate evidence exists that the original also would likely show Mr. Temple and his deceased wife as the owners. Thus we can consider this case as if the original certificate were in evidence, and it too failed to show Mr. Temple and his sister as owners. Where does that leave us?

¶18. To answer that question, it would be helpful first to understand in some detail the instrument that concerns us, namely, a certificate of deposit. There are three classes of savings certificates of deposit used by individuals:

> 1. § 75-3-104 -- Negotiable CD -- (all requirements met; Article 3 applies);
>
> 2. § 75-3-805 -- "Non-negotiable" CD -- (all requirements met except "order or bearer"; Article 3 applies with limitations); and
>
> 3. CDs that are otherwise not negotiable, i.e., by terms which preclude transfer (Article 3 does not apply).

*Isaacson v. Isaacson,* 508 So.2d 1131, 1133 (Miss. 1987), relying upon Steven L. Harris, *Non-Negotiable Certificates of Deposit: An Article 9 Problem,* 29 U.C.L.A. L. Rev. 330, 333 (1981).

¶19. Some of the rules have changed since *Isaacson*. For example, former § 75-3-805 making Article 3 partially applicable to non-negotiable instruments has been repealed. 1992 Miss. Law ch. 420, § 112. The repeal was part of a comprehensive set of amendments in a bill entitled "Uniform Revisions to UCC Article 3 Relating to Negotiable Instruments (NCCUSL)." 1992 Miss. House J. 91. Though we have not compared all 113 sections of the 1992 legislation to the uniform act, it appears to be a faithful adoption of the final 1990 draft of a new version of Article 3, prepared by the American Law Institute and the National Conference of Commissioners on Uniform State Laws. 2 Frederick M. Hart & William F. Willier, Negotiable Instruments § 1.08 (1999).

¶20. We find that no negotiation occurred here. However, that is not the only means to transfer an instrument.

> The term "transfer" describes an act of the parties, or of the law, by which title to property is conveyed from one person to another. The three principal modes of transfer are:
>
> (1) negotiation;
>
> (2) assignment; and
>
> (3) operation of law.
>
> Negotiation is the transfer of commercial paper in a way that gives the transferee title to the paper, together with additional rights [of a "holder in due course."]

5 Harold Weisblatt, Banking Law 115-5 (1999 ) § 115.02[1].

¶21. A transfer either of a negotiable instrument without the requisites of a "negotiation" or the transfer of a non-negotiable instrument can give rights to the transferee. *Id.* at 115-6 & 115-7. A negotiable instrument need not be negotiated in the technical sense; a transfer by assignment "is not prohibited by any provision of the Uniform Commercial Code." *Id.* at 115-7. An assignment of a negotiable certificate of deposit, which is not accompanied by an indorsement on the certificate, is effective but may not make the assignee a holder in due course. *Id.* at 115-6 n. 10, citing *Horbal v. Moxham Nat'l Bank,* 657 A.2d 1261, 1264-65 (Penn. Super. Ct. 1995), *aff'd* 697 A. 2d 577 (Penn. 1997). The dissent in *Horbal* argued that the assignment was solely as security, but the dissenter did not otherwise question the effectiveness of an assignment without an indorsement. *Horbal*, 697 A. 2d 584, 585-86 (Newman, J., dissenting). Consequently, even though the certificate in *Horbal* on its face apparently still showed the assignor's name, the assignment was nonetheless effective and made the assignee the owner. [1]

¶22. Simply put, the present version of Article 3 does not apply to a non-negotiable instrument. Miss. Code Ann. §§ 75-3-102 (a) (Supp. 1999). *See* 2 Hart & Willier, Negotiable Instruments 2-16 (1999) § 2.01[2]. By containing the word "non-negotiable" on its face, this certificate of deposit is governed by rules outside of Article 3. Miss. Code Ann. § 75-3-104 (d) (Supp. 1999).

¶23. The controlling rules are from the general law of contracts. What occurred here has some aspects of an assignment. When an assignment occurs, the "contract, rather than Article 3 of the Uniform Commercial Code, governs the rights of the parties, though the Code does confer certain rights on the assignee." 5 Weisblatt, Banking Law 115-7, § 115.02[1]. Temple went to the bank and signed documents that were represented to him as sufficient to create a survivorship interest in his sister. Perhaps rather than an assignment, what occurred here is more properly labeled a revision of the contract between Temple and the bank. Regardless of other labels, the agreement was at all times a contract subject to properly executed revisions by the parties.

¶24. The Code defines a certificate of deposit as an "an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money. A certificate of deposit is a note of the bank." Miss Code Ann.§ 75-3-104 (j). As a note of the bank, this certificate of deposit could be altered. There is nothing on the certificate that states that the names on the face of the certificate are binding. In fact, there is evidence that the bank gives force to the change on signature cards and other internal records.

¶25. A problem does exist, however, because to allow testimony to alter the written terms of the certificate of deposit runs afoul of the parol evidence rule. Even so, that rule cannot be applied until we first identify the total bundle of documents that forms the agreement.

> The written memorandum or contract is not required by the statute [of frauds] to be in one writing; it may be in several different writings necessarily connected with each other. If a paper signed by the party sought to be charged makes such reference to another writing as that, construing them together, all the terms of the bargain are expressed, it is sufficient under the statute, and parol evidence is admissible to identify the paper referred to and apply the reference.

*Central Shoe Co. v. J. P. Conn & Co.*, 160 Miss. 151, 155-56, 133 So. 126, 127 (1931).

¶26. The certificate of deposit of July 13, 1991, in fact represented the agreement of the parties as of that date. That agreement states that it is subject to "the rules and regulations of said bank pertaining to savings deposits." Subsequent to 1991, another agreement was entered that altered the terms. There was testimony that the change was made consistent with the rules followed by the bank. Those rules were incorporated by reference, as effective despite the parol evidence rule as if they were stated in full on the certificate itself. Without knowing the wording of the rules, we can for present purposes suppose that the certificate had written upon it that "changes to the ownership of this certificate can be made at anytime by the depositor, and will be reflected on the 'Customer Application and Signature Card' applicable to this certificate." Since that signature card is where the change appears, it is for the chancellor to evaluate the evidence regarding whether that is the means by which changes are properly made.

¶27. A precedent of this court does not prevent consideration of this proof. *Thornhill v. Chapman,* 97-CA-01476-COA (Miss. Ct. App. 1999). There the question was whether parol evidence was admissible to show that one person contributed the funds for a certificate of deposit, but by private agreement with the other owner he was to receive all the funds back at some date. This court refused to permit that evidence from altering the right of each named owner to claim the money. The *Thornhill* dispute between the two owners named on the certificate on how they should share the funds does not guide us regarding Mr. Temple's certificate. Our present concern is whether the named owner has complied with the bank's rules for changing ownership. Officials at the bank apparently wish to recognize the change. Nothing in the UCC nor in the parol evidence rule prevent their doing so.

¶28. This is not a case in which Mr. Temple informed a relative that he wished to make her the co-owner of the certificate but never took steps to accomplish that, or even told a bank official that this was his desire but nothing beyond the suggestion occurred. There is evidence that changes to ownership of certificates of deposit are accomplished at this bank in the manner followed by Mr. Temple prior to his death. Accordingly, we reverse and remand for the chancellor to determine whether the attempted change to ownership complied with the bank's rules.

¶29. **THE JUDGMENT OF THE LEE COUNTY CHANCERY COURT IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**McMILLIN, C.J., BRIDGES, LEE, AND MOORE, JJ., CONCUR.**

**PAYNE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY KING, P.J., IRVING AND THOMAS, JJ.**

PAYNE, J., DISSENTING:

¶30. Though I agree that the controlling legal principles in this case regarding a non-negotiable certificate of deposit are found in our general laws of contracts and not in the Uniform Commercial Code, I disagree with the majority's disposition of this matter and believe it to be contrary to law. Accordingly, I respectfully dissent.

¶31. In this case, Addington, supported by the bank's actions and with questionable substantiation, tries to show that the bank did what they say Temple desired be done with regard to the $50,000 certificate of deposit. Having set out her case, Addington advises us that the bank's actions must be acknowledged as the

legal requisites adequate to transfer title to the $50,000 certificate of deposit on the face of which there is no evidence of change.

¶32. In order for an appellate court to reverse the findings of a chancellor, we must find that "the court was manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard. *Dorman v. Dorman*, 737 So. 2d 426, 429( ¶4) (Miss. Ct. App. 1999) (citing *Andrews v. Williams*, 723 So. 2d 1175, 1177 (¶ 7) (Miss. Ct. App. 1998)). I find the chancellor reached the proper disposition and therefore, would affirm his decision.

¶33. Axiomatic in regard to interpreting the language of a written contract is the "four corners rule:"

> Legal purpose or intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence. *Cooper v. Crabb*, 587 So. 2d 236, 239 & 241 (Miss. 1991). *Thus, the courts are not at liberty to infer intent contrary to that emanating from the text at issue. Id*. at 241. Instead, when construing a contract, the court will read the contract as a whole, so as to give effect to all of its clauses. *Brown v. Hartford Ins. Co.*, 606 So. 2d 122, 126 (Miss. 1992). One should look to the "four corners" of the contract whenever possible to determine how to interpret it. *McKee v. McKee*, 568 So. 2d 262, 266 (Miss. 1990). Therefore, when interpreting a contract, the court's concern is *not nearly so much with what the parties may have intended, but with what they said*, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy. *Simmons v. Bank of Mississippi*, 593 So. 2d 40, 42-43 (Miss. 1992).

*Warwick v. Gautier Utility Dist.*, 738 So. 2d 212, 215 (¶ 8) (Miss. 1999) (emphasis added). Furthermore,

> It is only when an ambiguity appears between competing terms of the same contract or where the language of the contract is less than clear in its expression of the parties' intentions that the court must delve further in an attempt to discover and give effect to the true intention of the parties.

*Indep. Healthcare Mgmt., Inc. v. City of Bruce*, 746 So. 2d 881, 885(¶ 17) (Miss. Ct. App. 1998) .Finally, parol evidence is not admissible to create an ambiguity when one does not exist. *Welch v. Gant*, 161 Miss. 867, 138 So. 585, 586 (Miss. 1932).

¶34. I find no ambiguity on the face of the $50,000 certificate of deposit. Thus, in my view, the majority takes too much liberty in drawing favorable conclusions to its opinion by way of construing facts and drawing suppositions that are not supported by the record.

¶35. The first conclusion which I believe to be erroneously drawn regards whether or not ownership of the $50,000 certificate of deposit was changed at the same time the $90,000 certificate of deposit was re-issued in the name of Temple and Addington, his sister. The $90,000 certificate of deposit was changed on its face to show the ownership with Temple and Addington, jointly. The majority states, "*[a]pparently* at the same time, Temple requested that the bank re-issue the $50,000 certificate to himself and his sister. *It appears* that all of the necessary paperwork was completed, but the original certificate of deposit was never returned to the bank. *This may explain* why ownership of the certificate was not changed." (emphasis added). The lack of facts in the record has caused the majority to construe the situation as to create a favorable position for Addington to the detriment of the heirs of Temple's estate, essentially

negating an examination of the law as it applies to contracts and intestate succession. The assumption could just as easily be made that the bank had procedures for issuing duplicate or revised certificates of deposit which they failed to follow. The majority's exercise of drawing conclusions based on what they "think" the bank and the parties were attempting to accomplish is unnecessary and precarious. We have clear law in this area, and we have a duty to apply such law and to find that absent a change to the face of the certificate of deposit at issue, no new joint tenancy with Addington was created, and Temple's heirs are the rightful owners of the proceeds.

¶36. The next fact the majority infers, which is unsubstantiated in the record, involves the supposed existence of a signed document that acted to create the survivorship interest in Addington. The majority states, "Temple went to the bank and signed documents that were represented to him as sufficient to create a survivorship interest in his sister." No such signed documents appear in the court record. The only document I can find to which the majority perhaps is alluding is the document which is titled "Certificate of Deposits Customer Application and Signature Card," Exhibit 3. However, I cannot see how this customer application could be construed as having legal authority to create a survivorship interest for the sister, as the majority claims. Only bank employee McCaskill's signature appears on Exhibit 3. As well, it would turn the law on its end if a bank could tell the courts what is sufficient to create a survivorship interest under our laws. In fact, when the bank employee kept testifying that the deceased's instructions were followed, that such instructions put the legal title in Addington jointly with the deceased, and then started to tell what the original certificate of deposit would have had on it had it been presented for payment rather than the bank's copy, the chancellor commented from the bench:

> No, sir, that's highly speculative, I won't allow it in. You can make a record on that. She's testified about legal title, but I don't know that she had passed through law school or anything, counselor. And I'm certainly not taking that as proof of the fact that legal title is invested in anybody. I don't know where the original is, or what original we are even talking about, yet.

¶37. Nowhere on this record can I find Temple's signature authorizing a change in the ownership of the certificate of deposit. Again, Exhibit 3, purported to be the title transfer authorization for the $50,000 certificate of deposit, neither contains Temple's signature, initials, or mark of any kind nor any dollar figure linking it to the $50,000 certificate. Exhibit 8 bears Temple's signature, but there is nothing on the face of Exhibit 8 directly connecting it to Exhibit 3. Since McCaskill testified on cross-examination that Temple executed a Customer Application and Signature Card for issuance of the $90,000 certificate of deposit into his and Addington's name, for all practical purposes, Exhibit 8 could very well be Temple's signatory authorization transferring title to the $90,000 certificate of deposit.

¶38. If Temple had requested that his attorney prepare him a last will and testament and instructed his attorney to have the document notarized instead of having the instrument witnessed by at least two competent and credible witnesses, the will would still be invalid under Mississippi law, despite what Temple may have instructed or desired. *Wilson v. Polite*, 218 So. 2d 843, 849 (Miss. 1969).

¶39. Likewise is the case with the ownership transfer of the $50,000 certificate of deposit. I understand that Temple was a longtime officer of the bank that held this certificate of deposit. However, if we hold that a bank, by its internal records and without following its own rules as to approval of such changes, could effect a transfer of title to a certificate of deposit issued by the bank because a bank officer so requested, then we endanger investments in any certificates of deposit in any bank. What if there is an unreliable or dishonest

employee working at that bank?

¶40. I am no way suggesting that the bank employee in this case *sub judice*, McCaskill, is unreliable or dishonest. But, I simply find no evidence of Temple's desire to create a joint ownership of the $50,000 certificate, save McCaskill's recollection of events and the signature card (Exhibit 8) with no link to the identifying number of the $50,000 certificate or to Exhibit 3. The $90,000 certificate was modified on its face to change title; the explanation we are given for the bank's not changing the $50,000 certificate on its face is that Temple did not want to change the dates for renewal. However, McCaskill testified on cross-examination that the $50,000 certificate could have been reissued for a shorter period of time than 180 days and still retain the same renewal date.

¶41. In short, although the bank procedures show that it takes the signature of the customer to make a change in the legal title to the certificate as well as the approval of a bank officer, that procedure was not followed here. In my assessment, the record contains only one instance where Temple's handwriting allegedly evidences a desire to have the certificate of deposit in his sister's name. Such notation is found in Exhibit 11, a copy of the front of an envelope from the Bank of Mississippi, postmarked December 2, 1992. The words are:

Sister or me - $50,000

Evelyn Addington

No. 95-298-006

However, if one compares the handwriting on Exhibit 11 with the signature of Addington as found on Exhibit 8, one might infer that Addington, not Temple, wrote the notation on Exhibit 11. I am not saying that she did, nor even that she might not be the intended recipient of this certificate of deposit. What I am saying is that under the law of contracts, none of the intended safeguards necessary to effect a change in ownership were present. I do not believe that it is within the providence of this Court to enable such failure by Temple through the bank to accomplish the ownership change even if it would be a nice thing to do.

¶42. It may well be that justice is being served by the majority's action in this particular case. Temple was a good customer of the bank and, as a former bank officer, had experience in banking matters. Perhaps when he told McCaskill what to do, she found a way to do just that, regardless of the bank's procedure or the legal impact of his actions. In fact, or cross-examination, McCaskill admitted as much:

By Mr. Wicker: Was it normal to make the change of legal title on a date other then the renewal date, in 1992?

By Ms. McCaskill: It's not generally done. It would have been better had it been redone, but then again, when a customer requests, a bereaved customer as Mr. Temple was, you do tend to make exceptions.

As I stated, I believe this to be a dangerous precedent. A bank's exception to a rule of operation does not alter the law of this State.

¶43. At the very least, though I disagree with the majority's disposition of this case, the majority opinion should be read in a very limited fashion to these particular, peculiar facts that make it atypical. I make such

distinction to prevent persons in the future from believing that a bank can alter the ownership of a certificate of deposit without first getting a signature from the owner(s) of the certificate that relates *directly* to the desired change.

¶44. Banks and their customers are bound by the natural results of their actions, and change of ownership of a certificate of deposit cannot be made by internal operations of the bank alone. This record is incomplete with regard to documents that would show a change in ownership of the $50,000 certificate of deposit. Again, the only testimony at the trial came from McCaskill's face-saving statements who had a duty to follow the published regulations of the bank and from the self-serving declarations of Addington's daughter who is now claiming that we should look outside the four corners of the certificate of deposit (a true copy of which is in evidence) and vest her with title. If this is the way banking law works, we might do well to take instruction from our depression era ancestors who hid their money in their mattresses or buried it in Mason jars.

¶45. Finally, as a former law professor, I enjoy legal research as much as anyone, but I respectfully find the majority burdens its opinion with a long and unnecessary discourse on the history of the UCC only to state that it is inapplicable. I consider this discussion irrelevant to this case.

¶46. I would affirm.

**KING, P.J., IRVING AND THOMAS, JJ., JOIN THIS SEPARATE WRITTEN OPINION.**

1. *Horbal* was relying on the pre-1990 version of Article 3. *Horbal*, 697 A. 2d at 582 n.6. The point that is relevant for us is that when a "negotiation" has not been made, the transfer may still be effective but a transferee is not a holder in due course. That is still the law under the 1990 revisions. Miss. Code Ann. §§ 75-3-201 & 75-3-203 (Supp. 1999).