# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-02052-SCT

*CHRISTOPHER A. FERRARA*

**v.**

*NANCY S. WALTERS AND DENNIS R. STRONG*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/12/2003 |
| TRIAL JUDGE: | HON. CARTER O. BISE |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | THOMAS E. VAUGHN |
| ATTORNEYS FOR APPELLEE: | DAVID A. WHEELER |
| | CANDACE C. WHEELER |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 9/22/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., GRAVES AND RANDOLPH, JJ.**

**GRAVES, JUSTICE, FOR THE COURT:**

¶1.    On or about December 4, 2001, Nancy S. Walters and Dennis R. Strong (the "Sellers") entered into a contract with Christopher A. Ferrara to sell certain real property located in Harrison County, Mississippi. Prior to closing, Ferrara discovered a defect in the chain of title which was not properly cured by the Sellers. Ferrara filed suit in the Chancery Court of Harrison County seeking, inter alia, declaratory judgment and specific performance. The Sellers counterclaimed alleging slander of title, an intentional interference with a contract, and abuse of process. Following a bench trial, the chancellor entered judgment denying any relief to Ferrara, but granting the Sellers compensatory damages in the amount of $15,358.97 and

punitive damages in the amount of $30,000.00. Aggrieved by the chancellor's rulings, Ferrara appeals and asserts multiple assignments of error.

## FACTS AND PROCEDURAL HISTORY

¶2. Ferrara, a real estate venture capitalist, sought to purchase a large tract of land in Biloxi, Mississippi, for a substantial commercial project. Ferrara located a prime area for development and contracted for the purchase of contiguous properties within the tract. On or about December 4, 2001, the Sellers entered into a contract with Ferrara to sell one lot in a line of lots needed to provide access to the project. The subject property included a house located on a 50 feet by 85 feet lot which previously belonged to the Sellers' mother and father, Mr. and Mrs. J.W. Strong. Ferrara and the Sellers agreed to a purchase price of $37,500, with the closing date set for 45 days after the acceptance by the Seller. The contract also contained a provision that the possession date was upon the close of the sale and delivery of a warranty deed. Also, pursuant to the contract, Ferrara deposited $3000 with the Sellers' broker as earnest money. The contract further provided that the Sellers were to furnish a warranty deed to Ferrara and that a reasonable time would be permitted for an examination of the title. With regard to the title, the contract provided, "Should examination of the title reveal defect[s] which can be cured, the Seller[s] hereby obligates himself (themselves) to cure same as expeditiously as possible, and to execute and tender [a] Warranty Deed in accordance with the terms thereof."

¶3. After conducting a title search, Ferrara discovered that the subject property was previously owned by Cole R. Budd, who conveyed it via a warranty deed to Mr. and Mrs. J.W. Strong on July 11, 1950. The Budd-Strong conveyance was made without any reference to

2

rights of survivorship or otherwise. Therefore, Ferrara concluded that the property was jointly owned by Mr. and Mrs. Strong as tenants in common. Mr. Strong died on December 12, 1974.

¶4. On January 6, 2002, David Crane, Ferrara's attorney, contacted the Sellers' realtor and discovered that a quitclaim deed had been filed on December 1, 2000, purportedly conveying the subject property to the Sellers, who were two of the children of Mr. and Mrs. J. W. Strong.[1] This deed stated that the grantors were Mrs. Strong and all the heirs of Mr. Strong. Crane set out to discover whether there had been an adjudication of heirship or whether an estate had been opened on behalf of Mr. Strong. He wanted to determine whether those who executed the quitclaim deed to the Sellers had been adjudicated the sole heirs of Mr. Strong. Upon review, Crane determined that there was no record of any adjudication of the heirs of Mr. Strong, and there was no evidence of whether or not he died intestate. Ferrara then requested an updated title abstract on the subject property, which was not received until January 17, 2002.[2] Sometime during the week of January 17, Ferrara's attorney sent a completed, but undated, HUD-1 Settlement form to the Sellers' attorney. However, according to undisputed testimony from witnesses on both sides, there was never a date and time set for the closing. Seven days outside the 45-day period initially provided for pursuant to the contract, on January 25, Ferrara's attorney (Crane) contacted the Sellers' realtor (Curtis Harrison) and requested an

---

[1] The conveyance of the subject property from Mrs. Strong and the purported heirs of Mr. Strong showed all their signatures in November 2000.

[2] January 17, 2002, was significant inasmuch as it was one day before the 45-day period in which the closing was to occur. Pursuant to the contract, the closing was to take place on or before January 18, 2002.

additional three (3) weeks to close. The Sellers denied this request, and their real estate agent so advised Ferrara's attorney by letter on January 26, 2002.

¶5. As soon as Crane had learned of the quitclaim deed from Strong's heirs, he advised Ferrara that, in his opinion, the title was in fact defective. Crane presented Ferrara with the options of going forward with the sale with a defective title or requiring the Sellers to cure the defects under the contract. Ferrara directed Crane to send a letter to Harrison addressing their concerns about the defective title. Although the record does not contain such letter, Crane's January 25 letter to Harrison confirms that they had previously discussed the defects. The Sellers advised Ferrara, after the time to close the transaction had expired, that they were moving forward with a subsequent closing with an unrelated buyer. Ferrara filed the present action seeking, inter alia, specific performance, declaratory judgment relief and damages. Ferrara also filed a lis pendens notice which the Sellers contend prevented a subsequent sale to the third-party buyer for the sum of $40,000.[3] The Sellers counterclaimed for the loss of the sale of the property, out-of-pocket expenses, attorneys' fees and punitive damages for intentional interference with a contract.

¶6. This matter went to trial on July 17-18, 2002. The chancellor entered a judgment denying Ferrara any relief in this matter and granting relief to the Sellers on the counterclaim. The judgment provided for compensatory damages in the amount of $1,779.47 and attorneys' fees in the amount of $5,579.50. The final judgment was entered on November 14, 2002.

---

[3] The contract price of $40,000 with the third-party was approximately $2,500 more than the contract price under the Sellers' contract with Ferrara.

¶7. On December 4, 2002, some twenty (20) days after entry of judgment, the Sellers filed two motions. The first motion was for an evidentiary hearing pursuant to Miss. Code Ann. § 11-1-65(1)(c) in order for the chancellor to determine whether punitive damages were recoverable. The second motion sought relief from the judgment pursuant to Rule 60 of the Mississippi Rules of Civil Procedure, alleging that the chancellor had misapplied the law as set forth in § 11-1-65(1)(c). On September 12, 2003, some ten (10) months after the initial judgment, the chancellor entered an additional judgment, specifying the percentage of interest and awarding the Sellers punitive damages. The chancellor calculated interest on the $40,000 sale with the third-party buyer for 30 months at 8% or $8,000. The court then combined that number with the $1,779.49 compensatory damages award and the $5,579.50 attorneys' fees award, both of which had been awarded in the first judgment. Thus, the total award for compensatory damages, attorneys' fees and interest was set at $15,358.99. The court then entered a punitive damages award in the amount of $30,000. Ferrara timely appealed and asserted multiple assignments of error which have been consolidated for efficiency.

## DISCUSSION

### Standard of Review

¶8. Our standard of review regarding determinations of a chancellor is well-established.

> This Court will reverse a chancellor only where he is manifestly wrong. *Hans v. Hans,* 482 So.2d 1117, 1119 (Miss. 1986); *Duane v. Saltaformaggio,* 455 So.2d 753, 757 (Miss. 1984). A chancellor's findings will not be disturbed unless he was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Tinnin v. First United Bank of Miss.,* 570 So.2d 1193, 1194 (Miss. 1990); *Bell v. Parker,* 563 So.2d 594, 596-97 (Miss. 1990). Where there is substantial evidence to support his findings, this Court is without the authority to disturb his conclusions, although it might have found otherwise as an original matter. *In re Estate of Harris,* 539 So.2d 1040, 1043 (Miss.

5

1989). Additionally, where the chancellor has made no specific findings, we will proceed on the assumption that he resolved all such fact issues in favor of the appellee. *Newsom v. Newsom,* 557 So.2d 511, 514 (Miss. 1990). The chancellor's decision must be upheld unless it is found to be contrary to the weight of the evidence or if it is manifestly wrong. *O.J. Stanton & Co. v. Miss. State Highway. Comm'n.,* 370 So.2d 909, 911 (Miss. 1979).

*In re Savell,* 876 So.2d 308, 312 (Miss. 2004); *In re Johnson,* 735 So.2d 231, 236 (Miss. 1999). *See also Williams v. Williams,* 843 So.2d 720, 722 (Miss. 2003); *Cox v. F-S Prestress, Inc.,* 797 So.2d 839, 843 (Miss. 2003); *Holloman v. Holloman,* 691 So.2d 897, 898 (Miss. 1996). However, the chancery court's interpretation and application of the law is reviewed de novo. *Weissinger v. Simpson,* 861 So.2d 984, 987 (Miss. 2003); *Tucker v. Prisock,* 791 So.2d 190, 192 (Miss. 2001); *In re Carney,* 758 So.2d 1017, 1019 (Miss. 2000).

### I. Whether the Chancellor erred in refusing to require Sellers to correct defects in the title to the property and convey same.

¶9. Ferrara contends that the chancellor was manifestly wrong in failing to require the Sellers to correct the defect in the title to the property and convey the property pursuant to the terms of their contract. The standard of review for questions concerning the construction of a contract are questions of law that are committed to the court rather than to the fact-finder. *Warwick v. Gautier Utility Dist.,* 738 So.2d 212, 215 (Miss. 1999); *Miss. State Highway Comm'n v. Patterson Enters., Ltd.,* 627 So.2d 261, 263 (Miss. 1993). Because Ferrara calls into question the chancellor's ruling with regard to the rights of the parties under their December 4, 2001 contract, we will review the chancellor's ruling de novo.

6

¶10.    Ferrara advances one basic argument under this assignment of error.  He argues that the real estate contract in question provided, in pertinent part that:

> **TITLE:** The Seller[s] [are] to furnish [a] warranty deed.   Reasonable time shall be allowed for the examination of title.   Should examination of title reveal defects which can be cured, the Seller[s] hereby obligate (themselves) to cure same as expeditiously as possible, and to execute and tender a warranty deed in accordance with the terms thereof.

To this end, Ferrara argues that this covenant obligated the Sellers to provide good and merchantable title.

¶11.    The Sellers did not dispute that Mr. Strong, their father, died some years prior to the contract date, and in regard to his death, neither an estate was opened nor was there an adjudication to establish heirship.  However, they contend that the quitclaim deed was executed to the Sellers and was signed by all the heirs of Mr. Strong as well as his wife, Mrs. Strong, which is sufficient proof of title.  Ferrara contends that there was simply nothing of record to establish the heirship of Mr. Strong to determine who his lawful heirs were and to finally adjudicate that there were no outstanding, unknown or pretermitted heirs who might claim under his estate.  Accordingly, Ferrara maintains that the Sellers breached their agreement to provide good and merchantable title by failing to take  some action to establish the heirship.  To the extent that they failed to provide such title, Ferrara argues that the Sellers materially breached the contract.   Therefore, on the advice of counsel, Ferrara sought specific performance and declaratory judgment relief in order to protect his rights under the  contract.

¶12.    The chancellor ruled that Ferrara was not entitled to specific performance because Ferrara's request for three additional weeks after the January 25, 2002, deadline constituted

bad faith. Further, the order provides, "The request was refused by the [Sellers] and they declared the contract to be void by reason of [Ferrara]'s failure to comply with the terms of the contract, which the court finds was their right to do."

### Contract Language and Interpretation

¶13. Our law requires this Court to accept the plain meaning of a contract as the intent of the parties where no ambiguity exists. *Ass'n of Trial Lawyers Assur. v. Tsai,* 879 So.2d 1024, 1029 (Miss. 2004); *State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co.,* 797 So.2d 981, 986 (Miss. 2001); *I. P. Timberlands Operating Co. v. Denmiss Corp.,* 726 So.2d 96, 108 (Miss. 1998); *Phillips Petroleum Co. v. Stack,* 231 So.2d 475, 482 (Miss. 1969). Furthermore, "[c]ontracts are solemn obligations and this Court is obligated to given them effect as written." *I. P. Timberlands Operating Co.,* 726 So.2d at 108. In reviewing the relevant portion of the contract, it is abundantly clear that the Sellers were duty bound to render unto Ferrara a warranty deed. Anything less than that effectively resulted in Ferrara receiving less than what he bargained for under the terms of their agreement. Where the terms of a contract are without ambiguity, as in the instant case, the plain meaning of the terms speaks to the intent of the parties. Thus, we conclude that Ferrara intended to receive from the Sellers a warranty deed in exchange for adequate consideration, and upon detection of defects in title, Ferrara expected the Sellers to cure the defects within a reasonable period of time. Moreover, Ferrara in fact required a warranty deed because of the likelihood that financing or bonding of the anticipated multi-million dollar project could be impeded due to a defect in title. Proceeding with such a major project without a warranty deed would have been imprudent.

8

¶14. Ferrara argues that without an adjudication of heirship for Mr. J.W. Strong, there is no way to determine who his lawful heirs were. Hence, without an adjudication of heirship, Ferrara faced uncertainty as to the encumbrances of the realty.

¶15. In 1950 Cole R. Budd conveyed the subject property to Mr. and Mrs. J.W. Strong. We note that there was no indication from the deed as to what kind of estate was created, i.e., a tenancy by the entirety, joint tenancy or a tenancy in common. Further, the deed was without any reference to rights of survivorship or otherwise. To this end, we have held that in the absence of any survivorship provision, a joint tenancy will not be presumed. *In re Baker,* 760 So.2d 759, 762 (Miss. 2000) (citing *In re Isaacson,* 508 So.2d 1131, 1134 (Miss. 1987)). Therefore, we must conclude that the 1950 conveyance from Budd to Mr. and Mrs. J.W. Strong effectively created a tenancy in common with both husband and wife maintaining a one-half undivided interest in the realty. Further, as tenants in common, when Mr. Strong died intestate, his one-half undivided interest vested in his heirs at law, and Mrs. Strong maintained a one-half undivided interest plus whatever fractional interest she may have received as an heir of Mr. Strong.

¶16. At the time the contract between Ferrara and the Sellers was executed, Mrs. Strong was alive. Though she has subsequently died, Mrs. Strong's interest in the property at the time of her death was effectively vested in the Sellers via the quitclaim deed. Therefore, the title of the subject property is currently vested in the Sellers, subject to possible claims brought by any heirs at law of Mr. Strong who might have failed to convey their interests to the Sellers.

¶17. We have held that a contract to sell and convey real estate ordinarily requires a conveyance of the fee simple title which is free and clear of all liens and encumbrances, unless restricted by other provisions of the contract. *Jones v. Hickson,* 204 Miss. 373, 395, 37 So.2d 625, 629 (1948); *Union & Planters Bank & Trust Co. v. Corley,* 161 Miss. 281, 133 So. 232 (1931). A break in the chain of title renders the title to the realty unmarketable. K.F. Boackle, Mississippi Real Estate Contracts and Closings § 3-45, at 82 (2d ed. 2000).

¶18. Beyond this general proposition, where a contract expressly provides that a seller render unto the buyer a warranty deed, nothing less can be given in satisfaction of the seller's contractual obligation. When the seller agrees to convey property by warranty deed, he warrants that the title conveyed is without defect, i.e., clear and marketable. "The word 'warrant' without restrictive words in a conveyance shall have the effect of embracing all five covenants known to the common law, to wit: seizin, power to sell, freedom from encumbrances, quiet enjoyment and warranty of title." Miss. Code Ann. § 89-1-33 (1999). Because the contract here action obligated the Sellers to render a warranty deed, they possessed an affirmative duty to render to Ferrara a fee simple title which was clear and marketable. Further, where a contract expressly provides a reasonable opportunity for the seller to cure discovered defects in title, the seller's failure to cure constitutes a material breach of the contract. Inasmuch as the Sellers failed to seek an adjudication of the heirship[4]

---

[4] Under Mississippi law, there are two recognized ways of finally adjudicating the rightful heirship to property. One is to open an estate, and the other is to file a petition to establish heirship. *See* Miss. Code Ann. §§ 91-1-27 & 91-7-63 (Rev. 2004).

10

of Mr. J.W. Strong and failed to reasonably cure the defect in title, the Sellers breached their contract with Ferrara.

### Covenant of Good Faith and Fair Dealing

¶19.     All contracts carry an inherent covenant of good faith and fair dealing. *Cenac v. Murry,* 609 So.2d 1257, 1272 (Miss. 1992). "Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Id.* The covenant holds that "neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Cothern v. Vickers,* 759 So.2d 1241, 1248 (Miss. 2000). The covenant imposes a duty not to prevent or hinder the other party's performance, but may also impose a duty "to take some affirmative steps to cooperate in achieving these goals." *Cenac,* 609 So.2d at 1272.

¶20.     The Sellers' failure to cure the defect in title within a reasonable time period amounts to a breach of the covenant of good faith and fair dealings. Inasmuch as it was Ferrara's justified expectation to receive a warranty deed that was clear and free of title defects, the Sellers failed to meet those expectations. When the Sellers were notified of the problem, they were duty bound to take affirmative steps to cure the defect in an effort to allow both parties to receive their bargain under the contract. That they were not notified by their realtor of the problems with the title prior to the date of closing is of no moment here. By failing to correct the defect, the Sellers not only denied themselves of receiving that which they agreed to receive, but they also denied Ferrara of receiving a warranty deed to the subject property. The Sellers completely ignored their obligations under the contract with Ferrara and then pursued

a more lucrative deal with a third party.   When parties to a contract make mutual promises (barring some defense or condition which excuses performance), they are entitled to the benefit of their bargain.   The Sellers' conduct violated standards of fairness and reasonableness. As a result, we see no reason why Ferrara should be denied the benefit of his bargain.

¶21.   Considering these   propositions, we hold that plain meaning of the contract clearly represented the intent of the parties.   Thus, the chancellor committed reversible error by failing to enforce the relevant portions of the contract. This determination necessarily brings us to the second dispute presented in this appeal:   the time for closing and whether under the contract, time was of the essence.

> **II.      Whether the Chancellor erred in ruling that time was of the essence and that closing had to be achieved within the time prescribed for in the contract.**

¶22.   Ferrara argues that the chancellor committed reversible error in finding that under the sales contract, the time for performance was of the essence.  The chancellor ruled:

> Both Ray Stronsky, the real estate agent for [Ferrara] and Curtis Harrison, the real estate agent for the [Sellers], testified that they discussed the fact that the [Sellers] had priced the house for a "quick sale" in order to generate money to pay the health care costs of the [Sellers'] mother.
>
> . . . . . . . . . . . . .
>
> There are two findings of fact that are central to the court's analysis of this contract.   There is no doubt it was clear to everyone involved that time was of the essence to the Sellers.   The reason for the "quick sale," was because of the financial hardship resulting from the [Sellers]' mother's care.   There is no ambiguity in paragraph 6 of the written agreement prepared by [Ferrara]'s agent. The closing date was to be 45 days after acceptance by the Sellers.

The chancellor ruled that because time was of the essence, Ferrara's failure to close constituted a material breach, excusing performance by the Sellers. Ferrara challenged the chancellor's ruling by arguing, correctly, that the sales contract did not contain a provision which states that time is of the essence, and in the absence of such, time is not ordinarily regarded as of the essence.

¶23. We address two relevant equitable principles regarding the performance duties and obligations under the contract.

### Time of the Essence Provisions

¶24. "Unless a contract expressly states so, or unless there is otherwise shown to be a clear indication of intent, time is not ordinarily considered to be of the essence in the performance of a contract. *Gault v. Branton,* 222 Miss. 111, 75 So.2d 439, 445 (1954); *Lee v. Schneider,* 822 So.2d 311, 314 (Miss. Ct. App. 2002). We note that in order for equity to regard contracts as "of the essence," one of two conditions must be satisfied. In the absence of either condition, time will not ordinarily be considered of the essence in contract performance.

¶25. First, the contract must expressly state that time is of the essence. We acknowledge that the contract here on its face does not declare time to be of the essence as far as the scheduled closing date. To this end, we are called upon to consider the second condition. The second way for equity to regard timely contract performance as of the essence is there must be a clear indication of intent by the parties to the same. In his findings of fact, the chancellor stated that "there is no doubt it was clear to everyone involved that time was of the essence of the Sellers." However, the record reveals that during cross-examination of the Sellers' realtor, the specific question was asked, "[Do] you understand that you can put time is of the essence

13

on the contract?" The Sellers' realtor responded affirmatively. The realtor was asked, "Now, in this contract, you did not request the terms that time is of the essence?" The realtor responded negatively. The Court engaged in its own questioning of the Sellers and determined that the only individual aware of their desire to have a "quick sale" was Curtis Harrison, their real estate agent.

¶26. In *Lee v. Schneider,* the Court of Appeals dealt with a factually similar case. In *Lee,* a real estate contract set the closing to occur on or before June 30, 1994. *Id.* at 313. The sellers considered the contract to be voided or to be terminated for failure to perform within the time prescribed. *Id.* The purchaser instituted an action for specific performance in the Chancery Court of Pearl River County. *Id.* The trial court determined that the contract on its face did not provide time to be of the essence as far as the scheduled closing date was concerned. *Id.* Having so determined, the trial court ruled that the purchaser was entitled to specific performance if the defects could be worked out within a reasonable time and so ordered. *Id.* at 313-14. The seller appealed the ruling, and the Court of Appeals followed the reasoning of this Court in *Gault* and stated, "Unless the contract expressly so states, or unless there is otherwise shown to be a clear indication of intent, time is ordinarily not considered to be of the essence in the performance of a contract." *Id.*

¶27. Here, there is no clear indication (regarding time of performance) between the parties supported by the record. Indeed, the Sellers' realtor, Curtis Harrison, was the sole source of communication with Ferrara's realtor that he (Curtis Harrison) did not know why the closing date was set when it was and he was not advised of any exigency in the sale which was out of

the ordinary. During trial, Curtis Harrison testified that while he did not remember exactly why the Sellers wanted to close the property within 45 days, he did know that they insisted that he negotiate downward Ferrara's initial request for 60 days in which to close. Obviously, if the Sellers did not tell their realtor why time was of the essence, he could not have imparted any such information to Ferrara. It is undisputed that at no time was the point made to Ferrara or his agent that time was of the essence under this contract. A complete review of the record reveals that there was no clear indication as to the parties' intent to make time of the essence. To this end, we hold that the trial court was manifestly wrong to conclude otherwise.

¶28. We hold that in order for the trial court to determine the existence of a clear indication of the parties' intent with regard to time being of the essence, the trial court must consider all relevant circumstances surrounding the transaction. Because the contract in the instant action (i) did not contain a provision expressly stating that time to be of the essence, nor

(ii) can a clear indication of the parties' intent be ascertained from the relevant circumstances, we hold that time was not of the essence.

### Material Breach

¶29. The trial court ruled that because Ferrara failed to close, the Sellers were excused from performance under the contract. Because terminating a contract is viewed as an extreme remedy and should be granted sparingly, termination of the contract is not proper absent a material breach. *UHS-Qualicare, Inc. v. Gulf Coast Cmty. Hosp., Inc.,* 525 So.2d 746, 756 (Miss. 1987). A breach is material where there is "a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats [the purpose of the contract]." *Gulf South Capital Corp. v. Brown,* 183

15

So.2d 802, 805 (Miss. 1966); *McCoy v. Gibson,* 863 So.2d 978, 980 (Miss. Ct. App. 2003).

¶30.    In light of the present circumstances, we hold that Ferrara's refusal to close on January 18, 2002, occurred only because of the defect in title which was not properly cured by the Sellers.  To this end, we hold that the trial court erred in ruling that Ferrara's refusal to close constituted a material breach, relieving the Sellers of further performance.  Inasmuch as time was not of the essence, the onus was on the Sellers to correct the defects in title and to render to Ferrara that which he bargained for under the contract, a warranty deed.  With Miss. Code Ann. § 89-1-33 as guidance, the warranty deed which Ferrara sought, absent other restrictive language, would have the effect of embracing all five covenants known to the common law, to wit: seizin, power to sell, freedom from encumbrances, quiet enjoyment and warranty of title. Absent other lawful reasons why the contract should not be enforced, we conclude that the parties are bound to perform pursuant to the terms of their agreement.

¶31.    In light of the errors outlined above, we need not reach the remaining issues raised by Ferrara.   Because the contact between the Sellers and Ferrara should have been enforced according to its unambiguous terms, we hold that the judgment rendered in favor of the Sellers is completely erroneous for the reasons set forth supra.

## CONCLUSION

¶32.    For the foregoing reasons, we reverse  the judgments of the Chancery Court of Harrison County and remand this case with directions that the chancellor enter an appropriate judgment finally dismissing the Sellers' counterclaim with prejudice and requiring the Sellers to specifically perform under the contract.

16

¶33.    **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER AND COBB P.JJ., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR.  DIAZ AND DICKINSON, JJ., NOT PARTICIPATING.**