IRVING, J„
for the Court.
¶ 1. This appeal arises from a lawsuit regarding a series of contracts entered into by Glen Southern, Inc.,[1] and Marshall County. The Marshall County Chancery Court granted summary judgment in favor of Marshall County, and Glen Southern appeals and contends that the chancellor’s decision was in error. Finding no error, we affirm.
FACTS
¶ 2. The facts in this case are not at issue and are mostly undisputed. Glen Southern and Marshall County entered into a contract in 1952 and a related lease in 1954 for manufacturing facilities in Marshall County. Marshall County owned the land and leased the facilities to Glen Southern pursuant to the Balance Agriculture with Industry (BAWI) program, which had been promulgated by the legislature. The purpose of BAWI was to bring jobs and industry to Mississippi. For almost forty years, Glen Southern leased the property from Marshall County and ran a manufacturing facility thereon. Over the course of Glen Southern’s lease, additions and updates were made to the property, and new contracts and leases were executed for these expansions. The last contract was executed in 1969, and its corresponding lease was entered into in 1977. Each lease provided for a “primary term” for the agreement between Glen Southern and Marshall County and renewal terms that Glen Southern could opt for after the expiration of the primary term. The final primary term ended in 1990, at which time Glen Southern opted to renew its contract with the county.
¶ 3. In 1992, Glen Southern sublet the Marshall County facility to E.D. Smith-Gem, Inc., for ten years. The county approved the sublease. Before the expiration of the sublease, E.D. Smith sold its interests to Havatampa, Inc., and Glen Southern negotiated a new sublease with Havatampa. Havatampa used the facilities for manufacturing until sometime in mid-2003, when it vacated the premises. After Havatampa left, Glen Southern sublet the premises to Hunter Fan, Inc., for warehousing purposes. Around the same time, Marshall County petitioned the Marshall County Circuit Court for cancellation of the leases on the bases that Glen Southern had breached its contract and had abandoned the premises. Glen Southern requested that the case be transferred to chancery court because the relief request *1259 ed was one of equity, and its request was granted. Thereafter, the chancellor ruled that Glen Southern had breached the contract, thus entitling the county to cancellation of the leases.
¶ 4. Additional facts, as necessary, will be related during our analysis and discussion of the issue.
ANALYSIS AND DISCUSSION OF THE ISSUE
¶ 5. Unless a contract is ambiguous, interpreting its meaning is a question of law, not fact. A & F Props., LLC v. Madison County Bd. of Supervisors, 933 So.2d 296, 301(¶ 11) (Miss.2006). Therefore, this Court conducts a de novo review of a contract’s interpretation. Id. We must “accept the plain meaning of a contract as the intent of the parties where no ambiguity exists.” Id. at 301 (¶ 12) (quoting Ferrara v. Walters, 919 So.2d 876, 881(¶ 13) (Miss.2005)). We “will not rewrite or deem a contract ambiguous where the language is clear and indicative of its contents.” Id. (quoting Miss. Farm Bureau Mut. Ins. Co. v. Walters, 908 So.2d 765, 769(¶ 14) (Miss.2005)). Unless we find the contract ambiguous, we will not “go beyond the text to determine the parties’ true intent.” Id. (quoting Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc., 857 So.2d 748, 752-53(¶ 10) (Miss.2003)). Summary judgment will be affirmed only if there is no genuine issue of material fact present as to the contract’s meaning. M.R.C.P. 56(c). Glen Southern and Marshall County agree that there is no genuine issue of material fact, only a question of law as to the interpretation of the relevant contracts. Therefore, we look only at the proper interpretation of the contracts.
¶ 6. Our review of the contracts reveals that their provisions are clear and unambiguous. We find that those provisions operate in favor of the county such that it is entitled to cancellation of the leases. Because the last contract and lease reference only the original contract and its attached lease, we look only at those documents. None of the intervening leases and contracts were incorporated in any way in the final contract and lease between Glen Southern and Marshall County.
¶ 7. Section ll(m) of the 1952 contract contains a provision that reads:
The Company agrees that as promptly as is reasonably possible with due diligence after delivery to it of possession of the premises it will complete the installation of such additional machinery and equipment as it shall deem necessary to the operation of a factory for the purpose of manufacturing dust mops, wet mops, and other yarn and textile products of cotton or other fibre [sic] as it may see fit, and further agrees that it will operate said premises during the primary term herein provided for the manufacture of some such product suitable to the Company. With the express provision that if the Company should abandon said premises and fail to use or operate them for a period of one continuous year except such temporary cessation as may be caused by matters not within the control of the Company, such as damage, strikes, and force maj-eur, [sic] then at the option of the County this agreement may be terminated luithout further liability to either party.
(emphasis added). Marshall County relies on the emphasized portion of the provision to support its argument that Glen Southern has abandoned the premises so as to allow termination of the agreement.. Glen Southern argues that ceasing to use the premises for manufacturing does not constitute the kind of abandonment implicated in the provision. This section was specifically incorporated in the 1969 contract.
*1260 ¶ 8. Section 7(n) of the 1969 contract clarifies what purpose the facilities must be used for:
Said lease shall also provide that the Company, as promptly as is reasonably possible with due diligence after the delivery to it of possession of the premises, will complete the installation of such additional machinery and equipment as it shall deem necessary to the operation and use of the improvements contemplated by this contract, and use the same in connection with its manufacturing operation ...; provided, however, that nothing herein contained shall be construed to prevent the Company from manufacturing such other products in its factory as it may deem necessary or desirable so long as such manufacturing operation shall not constitute a nuisance or be inconsistent with the corporate powers of the Company.
(emphasis added).
¶ 9. Another provision in the 1969 contract provides that the terms and conditions of any renewal term are the same as those of the primary term, which ended in 1990:
Said lease shall also provide that the Company shall have the right and option to renew beyond the original primary term for seven (7) successive ten (10) year terms each and a final renewal term of eight (8) years, upon the terms and conditions herein stipulated for the primary term, except as said terms and conditions may be herein expressly modified for said renewal term or terms.
1969 contract, § 7(o) (emphasis added).
¶ 10. There are no provisions expressly modifying section 7(n), which plainly mandates that Glen Southern use the facility for manufacturing: “the Company ... will ... use the [machinery and equipment it installs] in connection with its manufacturing operation.” Although, as Glen Southern points out, other provisions of the contract restrict themselves to the primary term of Glen Southern’s occupation, there is no such limitation in section 7(n). In fact, section 7(o) clearly states that the renewal terms are to be on the same terms as the primary term, except as to rent and any provision expressly altered for the renewal term. As section 7(n) neither refers to rent nor does it contain an express alteration of the renewal term, section 7(n) is equally in effect during the primary and renewal terms of the lease.
¶ 11. Glen Southern also points to other provisions of the contract that limit themselves to the period of Glen Southern’s occupancy of the facility; however, section 7(n) does not limit itself to Glen Southern’s occupancy of the facility. In effect, section 7(n) creates a use restriction on the Marshall County facilities, which must be used for manufacturing in order for Glen Southern to meet the terms of its contract with Marshall County. Additionally, when sections 7(n) and (o) are viewed in conjunction with the abandonment provision in section ll(m), it is clear that Glen Southern is currently using and operating the facilities in a manner that constitutes abandonment of the premises, since the contracts require that the premises be used for manufacturing.
¶ 12. Our interpretation of the contract also gives effect to another provision that references the jobs that were intended to be created by Glen Southern’s use of the facilities. Section 7(r) of the 1969 contract reads:
Said lease shall also provide that the parties have not agreed to any definite increase of employment but the Company by the execution of the lease and the contract giving rise thereto acknowledges that in good faith the Company will use the improvements, facilities and buildings described therein in connection with the operation of its manufacturing *1261 plant above set forth with the intent to furnish employment to persons in and about the County of Marshall during its occupancy thereof.”
(emphasis added).
While the provision simply states that Glen Southern has not agreed to any “definite increase” in employment, it also states that employment is the intent of the contract. Nothing in the provision expressly allows Glen Southern to decrease employment at the facilities. There is no dispute that the warehousing that is currently taking place at the property is not providing anywhere near the number of jobs that were being provided before the facilities began being used solely for warehousing. Glen Bailey, who was deposed on behalf of Hunter Fan, testified that the facility currently employs only six full-time employees. Clearly, using the facilities only for warehousing is in conflict with section 7(r), which states that the intent of the contracts is to provide employment opportunities in Marshall County.
¶ 13. Since we have found that the contracts clearly intended for the facilities to be used for manufacturing, we turn to some of Glen Southern’s other arguments. First, Glen Southern contends that cancellation of the contracts was a severe measure that should not have been taken by the court and implies that the county should have sought some form of monetary damages. However, the contract clearly contemplates that the only remedy for a breach is cancellation of the agreement between Glen Southern and Marshall County. No other damages are contemplated by the contract. In fact, it is unclear to this Court what monetary damages Marshall County could seek against Glen Southern. The harm to the county is that the facility is not being used for manufacturing, creating an insufficient number of jobs. This is a harm that can only be remedied by exactly the relief that Marshall County has sought and been granted. Indeed, this remedy was specifically contemplated by section ll(m), which states that “this agreement may be terminated without further liability to either party” upon abandonment of the premises.
¶ 14. Glen Southern implies that termination of the agreement is duplicitous on the county’s part, as there is evidence in the record that the county has told Hunter Fan that it will be able to use the facility for warehousing regardless of whether Glen Southern prevails in the lawsuit; i.e., there is evidence that Marshall County is prepared to lease the facility to Hunter Fan for exactly the purpose for which it is being used: warehousing. Even accepting such evidence as conclusive proof of the county’s intent, what may happen in the future between Hunter Fan and Marshall County has no bearing on how the contract between Glen Southern and Marshall County must be interpreted. The contract clearly prohibits the use of the facility for any purpose other than manufacturing. By Glen Southern’s own admissions, the facility is not being used for manufacturing and has not been used for manufacturing since Hunter Fan sublet the facility. Clearly, the county is entitled to the only remedy contemplated by the contract: cancellation of the agreement and release of Glen Southern and Marshall County from any further obligations to each other.
¶ 15. Glen Southern also contends: “In arguing the facility must forever be used only for a single purpose, the County argues not only against its own actions, but also against a strong and longstanding public policy that allows lessees the maximum freedom to use them property for any lawful purpose.” As support for this argument, Glen Southern cites Kinchen v. Layton, 457 So.2d 343, 345 (Miss.1984), Andrews v. Lake Serene Prop. Owners *1262 Ass’n, Inc., 434 So.2d 1328, 1331 (Miss.1983), and Skrmetta v. BTN, Inc., 129 Fed.Appx. 906, 908 (5th Cir.2005) (a federal ease construing Mississippi state law). In Kinchen, the Mississippi Supreme Court- addressed the enforceability of a protective covenant prohibiting the placement of “temporary structures” on a residential lot. Kinchen, 457 So.2d at 344. While the Kinchen court stated that “[t]he law of this and every other state that we know anything about favors free and unobstructed use of real property,” the court also stated: “Such covenants may be employed and enforced, so long as clear language is used.” Id. at 345-46. Therefore, this case is of no help to Glen Southern, because the language in the case at bar is amply clear. The Andreivs court, which also dealt with the enforcement of a protective covenant, came to the same conclusion as the Kinchen court: that a protective covenant may be enforced so long as it is written in “clear and unambiguous wording.” Andreivs, 434 So.2d at 1331-32. Therefore, Andrews is also of no help to Glen Southern. Citing Kinchen, the Skmietta court stated: “courts may not read a restrictive covenant into an open-use contract that does not contain an express covenant of continuous use.” Skrmetta, 129 Fed.Appx. at 908. Because there is an express provision in the Glen Southern/Marshall County leases that limits use of the facility to manufacturing, Skmietta is also of no help to Glen Southern. We note that section 7(n) does not state simply that the purpose of the lease between Glen Southern and Marshall County is for Glen Southern to conduct manufacturing; rather, the contract specifically states that Glen Southern “will [use the facility] in connection with its manufacturing operation .... ” (emphasis added). This is an express prohibition on use of the facility for other purposes, not merely, as Glen Southern argues, a statement of “the parties’ intent as to the initial use of the property.”
¶ 16. Glen Southern also cites a number of cases for the proposition that statements in contracts as to purpose are generally construed permissively — to allow the stated use — rather than restrictively — to prevent other uses. See, e.g., Ewing v. Adams, 573 So.2d 1364, 1368 (Miss.1990); Sec. Builders, Inc. v. Sw. Drug Co., 244 Miss. 877, 883-84, 147 So.2d 635, 637 (1962). However, we note that none of these cases are directly on point with the case before us. The leases between Glen Southern and Marshall County were entered into pursuant to BAW-I legislation, which in 1952 mandated that the facilities be used to attract employment, specifically in fields such as manufacturing. 1944 Miss. Laws 420. It was not until several years after the initial contracts between Glen Southern and Marshall County that the legislation was changed to permit warehousing as a permissible use under BAWI. See Miss.Code Ann. § 57-3-5(2)(b) (Rev.2003). The sole purpose of the contracts between the parties was to provide employment for Marshall County. In the cases cited by Glen Southern, however, the contracts at issue were entered into between private individuals who had no such public purpose. This distinguishes those cases from the case before us. We decline to view the clear language in the contracts at issue as being merely permissive when they were clearly intended to be restrictive.
¶ 17. Glen Southern points to its pre-Hunter Fan subleases, which were approved by the county, where language was included to the effect that the facility could be used for any lawful purpose. However, as the chancellor found, while the subleases contained such language, the parties agree that the tenants before Hunter Fan used the facilities only for manufacturing. *1263 Therefore, there was no issue as to whether the property was being used in accordance with the contracts' between Glen Southern and Marshall County. However, there is now an issue as to whether the facility is being used for manufacturing. What language was contained in prior subleases has no bearing on the matter before us. Had Havatampa or E.D. Smith sought to use the facility only for warehousing, it is likely that this lawsuit would have been litigated during the term of their occupancy of the facility. The reality is that neither Havatampa nor E.D. Smith used the facility for any purpose other than manufacturing, regardless of the language in the subleases.
¶ 18. Glen Southern contends that the following language in the 1969 contract necessitates a finding in its favor: “After the expiration of the primary term, the Company may, at its discretion, assign any lease or renewal thereof or sub-let [sic] the said premises to any person, firm or corporation.” 1969 Contract, § 7(q). Glen Southern reads this to mean that, after the primary term of the lease, which expired in 1990, Glen Southern was free to sublet the premises to anyone-including a corporation or individual who would use the premises only for warehousing. We cannot agree. The clear meaning of the provision is what it says: that the county will not prevent Glen Southern from subletting the premises to whomever it chooses. However, section 7(n) requires that the facility be used for manufacturing. Therefore, whomever Glen Southern sublets the premises to must also use the facility for manufacturing. Nothing in section 7(q) removes the use restriction, although it easily could have read: “After the expiration of the primary term, the Company may, at its discretion, assign any lease or renewal thereof or sub-let [sic] the said premises to any person, film or corporation, and such person, firm or corporation may use the premises for any lawful purpose.” As previously stated, we look only to what the contract actually says, not what it might have said or what it appears that the parties might have intended it to say. In doing so, we give effect to both section 7(n) and section 7(q), whereas Glen Southern’s interpretation of section 7(q) would negate the clear meaning of section 7(n). As stated by the Mississippi Supreme Court, “[w]hen construing a contract, we will read the contract as a whole, so as to give effect to all of its clauses.” Royer Homes, 857 So.2d at 752(¶ 10) (citing Brown v. Hartford Ins. Co., 606 So.2d 122, 126 (Miss.1992)).
¶ 19. Glen Southern also intimates that its ownership of property on three sides of the facility means that the county’s reclamation is less than optimal. Be that as it may, if the county needs any of the property owned by Glen Southern, it can enter into negotiations with Glen Southern to purchase or lease the property. Glen Southern’s ownership of the adjoining properties has no effect on the terms of its contract with Marshall County.
¶ 20. Because we find that summary judgment on behalf of the county was proper in this case, we affirm the judgment of the chancery court.
¶ 21. THE JUDGMENT OF THE CHANCERY COURT OF MARSHALL COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. ROBERTS, J., NOT PARTICIPATING.

. Although this appeal is styled as though prosecuted by two separate companies, the record indicates that Glen Southern and GEM Southern are different names for the same business entity; attorneys for Glen Southern also stated as much during oral argument before this Court. Therefore, we address the Appellants only as "Glen Southern."