20 So.3d 1242 (2008)
Gregory S. DALTON, Individually and d/b/a Louisville Electronics, Appellant,
v.
CELLULAR SOUTH, INC., Appellee.
No. 2007-CA-00750-COA.
Court of Appeals of Mississippi.
September 16, 2008.
Rehearing Denied March 10, 2009.
*1244 William Liston, Winona, Dewitt T. Hicks, Columbus, John M. Montgomery, Sara E. Woodrell, attorneys for appellant.
Charles L. McBride, Anne C. Sanders, Katie L. Wallace, Jackson, attorneys for appellee.
EN BANC.
ROBERTS, J., for the Court.
¶ 1. Cellular South, Inc., sued Gregory S. Dalton and sought a declaratory judgment. Cellular South claimed it properly terminated its agency relationship with Dalton. After discovery, both parties filed motions for summary judgment. The Winston County Circuit Court found that the agreement between Dalton and Cellular South was unambiguous and granted summary judgment on behalf of Cellular South. Aggrieved, Dalton appeals and claims the circuit court erred when it granted Cellular South's motion for summary judgment. Dalton also claims the circuit court erred when it denied his motion for partial summary judgment. Finding no error, we affirm the judgment of the circuit court.

FACTS
¶ 2. Dalton owned a Radio Shack in Louisville, Mississippi. In April 1992, Dalton entered into an agreement with Cellular South to work as an agent selling cellular telephone service. Cellular South drafted the initial agreement, which was replaced in March 1993. It is unclear whether Dalton had any input as to the terms of either agreement. Dalton's agency relationship with Cellular South lasted for thirteen years. During that time, Dalton procured over six thousand customers for Cellular South. In return, Dalton received substantial commissions for his sales of Cellular South subscriptions.
¶ 3. In December 2003, Terrell Knight, then director of sales for Cellular South, sent Dalton a letter informing him that his agreement with Cellular South was being terminated effective February 6, 2004, as a result of "a reorganization of Cellular South's retail distribution plan...." Cellular South also sent Dalton a full and final release. Dalton refused to sign the full and final release.
¶ 4. Cellular South filed suit against Dalton, requesting a declaratory judgment to the effect that it had not acted contrary to the terms of the agency agreement. As mentioned, both parties filed motions for summary judgment. The circuit court ultimately granted Cellular South's motion for summary judgment. Additionally, the circuit court denied Dalton's motion for partial summary judgment. Additional facts will be discussed as necessary.

ANALYSIS

WHETHER THE CIRCUIT COURT ERRED WHEN IT GRANTED CELLULAR SOUTH'S MOTION FOR SUMMARY JUDGMENT.
¶ 5. Summary judgment is properly granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Glover ex rel. Glover v. Jackson State Univ., 968 So.2d 1267, 1274(¶ 18) (Miss.2007) (quoting M.R.C.P. 56(c)). As explained by the Mississippi Supreme Court, "the court must grant summary judgment unlessas to each material issue of disputed fact raised by the moving partythe record demonstrates at least the minimum quantum of evidence sufficient to justify a determination in favor of the non-moving party by a reasonable juror." Id. at 1274(¶ 19). We will view all of the evidence "in the light most favorable to the party against whom the motion has been *1245 made...." Thomas v. The Columbia Group, LLC, 969 So.2d 849, 852(¶ 10) (Miss.2007).
¶ 6. At the outset, we quote at length from the relevant portions of the contract between Dalton and Cellular South:
3.1 Term: The term of the Agreement shall be one year, commencing on the date specified in Exhibit D of this Agreement, unless otherwise terminated or renewed pursuant to the provisions hereinafter provided. Cellular Holding[1] is cognizant of the increasing value of the Agency relationship to a successful AGENT and therefore will terminate a successful Agency relationship only if Cellular Holding determines that the continuation of the Agency relationship would be detrimental to the overall well[-]being, reputation and goodwill of Cellular Holding.

....
3.4 Default: In the event AGENT fails to perform any of its obligations under this Agreement and such failure continues unremedied for a period of thirty (30) days after written notice is given by Cellular Holding to AGENT, then Cellular Holding may thereupon elect to cancel and terminate this Agreement, which termination shall be effective immediately upon the expiration of said thirty-day period.
3.5 Termination: Either party may terminate this Agreement by giving the other party written notice of its desire to terminate at least thirty (30) days prior to the intended date of termination.
[The section goes on to list specific instances under which Dalton's conduct could result in termination by Cellular South.]
....
4.6 Sales Activity: AGENT shall act as a sales AGENT appointed by Cellular Holding for Cellular Holding's Cellular Telephone Service. AGENT shall provide appropriate sales facilities and use its best efforts to enhance the sale of Cellular Holding service and to solicit customers using administrative procedures established from time to time by Cellular Holding;
....
(Emphasis added).
¶ 7. Dalton claims that the court erred by failing to follow the proper rules of contract construction. Specifically, Dalton complains that the court "erred in its negotiation of the three-tiered approach by determining that the Agreement was unambiguous based on matters outside the four corners of the instrument, namely, the self-serving Affidavit of Hu Meena...."
¶ 8. Mississippi uses "a three-tiered approach to contract interpretation." One South, Inc. v. Hollowell, 963 So.2d 1156, 1162(¶ 10) (Miss.2007) (quoting Facilities, Inc. v. Rogers-Usry Chevrolet, Inc., 908 So.2d 107, 111(¶ 7) (Miss.2005)). As explained by the Mississippi Supreme Court:
First, the "four[-]corners" test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement.... We must look to the "four corners" of the contract whenever possible to determine how to interpret it. McKee v. McKee, 568 So.2d 262, 266 (Miss.1990). When construing a contract, we will read the contract as a whole, so as to give effect to all of its clauses. Brown v. Hartford Ins. Co., 606 So.2d 122, 126 (Miss.1992). *1246 Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy.... On the other hand, if the contract is unclear or ambiguous, the court should attempt to "harmonize the provisions in accord with the parties' apparent intent." Pursue Energy Corp. [v. Perkins], 558 So.2d [349,] 352 [(Miss. 1990)]. Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent. Id.

Id. (quoting Facilities Inc., 908 So.2d at 111(¶ 7) (emphasis in original)). If the four corners of the contract fail to yield a clear understanding, the court then looks at the canons of contract construction and parol evidence if necessary. Id. at 1162-63(¶ 10) (quoting Facilities Inc., 908 So.2d at 111(¶ 7)).
¶ 9. Our review of the circuit court's opinion reveals that Dalton is mistaken as to how the court interpreted the agency agreement. The court did not refer to Meena's affidavit in determining whether the contract was ambiguous. Rather, the court determined as follows:
After reading the Agreement and giving effect to all of its clauses this court is satisfied that it is unambiguous and that there is only one reasonable interpretation of the terms for terminating the contract. It is clear to this court that it need not go any further than the first tier of contract interpretation.... The termination terms in the Agreement are unambiguous when read as a whole.
The first sentence of section 3.5 establishes the only way that Dalton may terminate the Agreement. He may terminate the Agreement for any reason as long as he gives thirty (30) days written notice of his intent to terminate.
Cellular South may terminate the Agreement by giving thirty (30) days written notice pursuant to the first sentence in section 3.5, but its reasons for termination are limited by the second sentence in section 3.1. It may terminate the Agreement only if it determines that a continuation of the agency relationship will be detrimental to the overall well[-]being, reputation and goodwill of Cellular South.
....
Dalton has the freedom to terminate the agreement for any reason, or for no reason at all, as long as he gives thirty (30) days written notice to Cellular South. However, Cellular South's right to terminate is limited by the standard in section 3.1. Only if it determines that a continuation of the Agreement would be detrimental to its overall well-being, reputation and goodwill could it terminate the Agreement. However, just as Dalton has the right to terminate the Agreement for the reason of his choosing, Cellular South pursuant to section 3.1 has made itself the sole arbiter of what would be detrimental to its overall well-being, reputation and goodwill. There is nothing in the second sentence of section 3.1 that limits Cellular South's right to terminate the Agreement only in the event that Dalton does something that is detrimental to the overall well-being, reputation and goodwill of the company. "Overall" means company wide, not just the seven counties where Dalton was serving as an agent.
Here, Cellular South for the reasons stated in the affidavit of Hu Meena, decided that a continuation of the agency agreement with Dalton, or with any other agent, would be detrimental to the overall well-being, reputation and good-will *1247 of the company. Although Dalton contends that a jury must make the determination as to whether the continuation of the agency agreement with him would be detrimental to the overall well-being, reputation and goodwill of Cellular South, it is clear from the terms of the Agreement that Cellular South had the right to make that determination. Because the terms of the Agreement are clear and unambiguous, this court cannot second guess the corporate decision of Cellular South to terminate the relationship with Dalton.
It is clear from the circuit court's opinion that the court did not find the contract ambiguous and did not go beyond the first tier of contract construction in resolving the dispute. We agree with the circuit court's conclusion that the contract was not ambiguous.
¶ 10. The agreement stated that its term would be for only one year, "unless otherwise terminated or renewed pursuant to the provisions hereinafter provided." The agreement went on to state that Cellular South would "terminate a successful Agency relationship only if Cellular Holding determine[d] that the continuation of the Agency relationship would be detrimental to the overall well[-]being, reputation and goodwill of Cellular Holding."
¶ 11. Cellular South's stated reasons for finding it detrimental to continue its agency relationship with Dalton were as follows:
[1] the administrative burdens that [Cellular South] had experienced in managing independent agents throughout the service area ... includ[ing] assigning a dedicated management employee to oversee the agents, keeping up with commissions earned by the agents... and insuring that agents were marketing Cellular South's service in a manner consistent with Cellular South's corporate marketing strategy.
[2] [providing] uniformity of the customers' experiences in dealing with Cellular South, regardless of whether they contact Cellular South by visiting its stores, calling on the telephone or using the Cellular South website.[[2]]
[3] [the impracticality of maintaining] some agents while terminating others, since the administrative burden of maintaining a few agents would have been very similar to the burden of maintaining them all.
It is essential to note what is not in the agreement. No provision in the agreement requires that Cellular South announce or discuss its reasoning for finding it detrimental to continue an agency relationship. There is no provision that requires an agent to agree with Cellular South's reasoning or find it satisfactory. Additionally, the agreement does not require that a detached third party agree with Cellular South's determination of detriment. The agreement only requires that Cellular South determine that a continued agency relationship would be to its detriment. Cellular South did not abdicate its responsibility to decide what is in its own best interest. To the contrary, the agreement explicitly preserved that right.
¶ 12. The agreement contemplates that Cellular South can terminate the agreement if termination is in Cellular South's "overall well[-]being." If termination of Dalton's agency agreement helps Cellular South achieve maximum profitability, *1248 that certainly flows from Cellular South's "overall well[-]being." After all, Cellular South is a "for profit" corporate entity. To hold that Cellular South cannot terminate the agency relationship under these circumstances requires an implied modification of the agreement, and we "do not have the power to ... modify, add to, or subtract from the terms of [an agreement]." Citizens Nat'l Bank v. L.L. Glascock, Inc., 243 So.2d 67, 70 (Miss.1971). Mississippi law requires that we "accept the plain meaning of a contract as the intent of the parties where no ambiguity exists." Ferrara v. Walters, 919 So.2d 876, 882(¶ 13) (Miss.2005). "[C]ontracts are solemn obligations and this Court is obligated to [give] them effect as written." Id. (quoting IP Timberlands Operating Co. v. Denmiss Corp., 726 So.2d 96, 108(¶ 50) (Miss.1998)).
¶ 13. There is no genuine issue of material fact that would require resolution by a fact-finder. From a logistical standpoint, any such resolution would reach the same conclusion. A fact-finder could only resolve a remanded question in one of two ways: (a) Cellular South terminated the agreement to avoid paying commissions to Dalton, or (b) Cellular South did not terminate the agreement to avoid paying commissions to Dalton. If a fact-finder reaches the first result, it cannot be said that maximization of profits would fail to affect Cellular South's "overall well[-]being." If Cellular South would lose money by continuing its agency relationships, it would be detrimental to Cellular South's "overall well[-]being" to continue them. Profitability is a component of Cellular South's "overall well[-]being." That is, it is in Cellular South's best interest to retain money that it would otherwise pay to independent agents if in so doing Cellular South maximizes its profitability and achieves uniform customer service at terms it can control.
¶ 14. Moreover, if a fact-finder reached the second possible result, then the question becomes moot based on Cellular South's other stated reasons for finding the continued agency relationship detrimental. Under either possible conclusion, the result is the same-Cellular South acted within its contractual rights to terminate the agency relationship with Dalton. Thus, one could argue that the agreement had no real "teeth," and it was a bad bargain on Dalton's behalf. That may very well be true, but "experience shows that people often imprudently make contracts ... yet every person must presume to know the law, and in the absence of some misrepresentation or illegal concealment of facts, the person must abide by the consequences of his contracts and actions." Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc., 857 So.2d 748, 757(¶ 26) (Miss.2003) (citation omitted). In summary, either of the two possible resolutions on remand requires the same result; therefore, there is no genuine issue of material fact, and we find no error in the circuit court's decision to grant Cellular South's motion for summary judgment. M.R.C.P. 56(c).
¶15. THE JUDGMENT OF THE WINSTON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., BARNES, ISHEE AND CARLTON, JJ., CONCUR.
IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, P.J., AND CHANDLER, J. GRIFFIS, J., NOT PARTICIPATING.
IRVING, J., DISSENTING:
¶ 16. With respect for my colleagues in the majority, I must dissent from the majority's *1249 decision to affirm the trial court's grant of summary judgment in favor of Cellular South, Inc. (Cellular South). I agree with the majority that the contract that Gregory S. Dalton and Cellular South executed is not ambiguous and that under the terms of the contract Cellular South is given the unilateral right to determine whether it is in Cellular South's best interest to continue the agency relationship created by the contract. However, I cannot agree that there is no genuine issue as to whether Cellular South terminated the contract in accordance with the terms of the contract.
¶ 17. Cellular South sued Dalton, seeking a declaratory judgment to the effect that Cellular South had acted properly in terminating its agency relationship with Dalton. After discovery, both parties filed motions for summary judgment. The Winston County Circuit Court found that the agreement between Dalton and Cellular South was unambiguous and granted summary judgment on behalf of Cellular South.
¶ 18. At the time that the complaint was filed, Dalton owned a Radio Shack in Louisville, Mississippi. In April 1992, Dalton entered into an agreement with Cellular South to work as an agent selling cellular telephone service. Cellular South drafted the initial agreement, which was replaced in March 1993. It is unclear whether Dalton had any input as to the terms of either agreement. Dalton's agency relationship with Cellular South lasted for thirteen years, during which time Dalton procured over six thousand customers for Cellular South. In return, Dalton received substantial commissions for his sales of Cellular South subscriptions.
¶ 19. In December 2003, Terrell Knight, then director of sales for Cellular South, sent Dalton a letter informing him that his agreement with Cellular South was being terminated effective February 6, 2004, as a result of "a reorganization of Cellular South's retail distribution plan...." Believing that the terms of his contract prohibited Cellular South from terminating the agreement as it did, Dalton refused to sign the full and final release sent to him by Cellular South. On January 24, 2006, Cellular South filed suit against Dalton, requesting a declaratory judgment to the effect that it had not acted contrary to the contract's terms. On April 5, 2007, the court ruled in favor of Cellular South, finding that it had the right under the contract to terminate its relationship with Dalton.
¶ 20. The relevant portions of the contract between Dalton and Cellular South state:
3.1 Term: The term of the Agreement shall be one year, commencing on the date specified in Exhibit D of this Agreement, unless otherwise terminated or renewed pursuant to the provisions hereinafter provided. Cellular Holding[3] is cognizant of the increasing value of the Agency relationship to a successful AGENT and therefore will terminate a successful Agency relationship only if Cellular Holding determines that the continuation of the Agency relationship would be detrimental to the overall well-being, reputation and goodwill of Cellular Holding.

* * * * * *
3.4 Default: In the event AGENT fails to perform any of its obligations under this Agreement and such failure continues unremedied for a period of thirty (30) days after written notice is given by Cellular Holding to AGENT, *1250 then Cellular Holding may thereupon elect to cancel and terminate this Agreement, which termination shall be effective immediately upon the expiration of said thirty-day period.
3.5 Termination: Either party may terminate this Agreement by giving the other party written notice of its desire to terminate at least thirty (30) days prior to the intended date of termination.
[The section goes on to list specific instances under which Dalton's conduct could result in termination by Cellular South.]
* * * * * *
4.6 Sales Activity: AGENT shall act as a sales AGENT appointed by Cellular Holding for Cellular Holding's Cellular Telephone Service. AGENT shall provide appropriate sales facilities and use its best efforts to enhance the sale of Cellular Holding service and to solicit customers using administrative procedures established from time to time by Cellular Holding;
¶ 21. The majority finds that the loss of profits by Cellular South is a sufficient basis, under the express terms of the contract, for Cellular South to terminate the contract. I disagree with this myopic interpretation. The contract authorizes termination by Cellular Holding "only if Cellular Holding determines that the continuation of the Agency relationship would be detrimental to the overall well-being, reputation and goodwill of Cellular Holding." (Emphasis added). It is clear to me that the financial well-being of Cellular South is only one of three criteria that must be met before termination is authorized. The other two are that there be a detriment to the reputation and goodwill of Cellular South.
¶ 22. In support of its motion for summary judgment, Cellular South offered the affidavit of Hu Meena. Meena explained that Dalton's agency relationship was being terminated because:
Mr. Dalton's was one of approximately ninety (90) agency relationships terminated by Cellular South at my direction in late 2003 and early 2004. Cellular South's decision to discontinue the use of independent agents was in large part due to the administrative burdens that it had experienced in managing independent agents throughout its service area. These administrative burdens included assigning a dedicated management employee to oversee the agents, keeping up with commissions earned by the agents, which did not vest until the customer had remained with Cellular South for a pre-determined period of time, and insuring that agents were marketing Cellular South's service in a manner consistent with Cellular South's corporate marketing strategy.
At or about the same time that I made the decision to terminate the independent agents used by Cellular South, Cellular South's own network of company-owned retail stores had become sufficient to perform its necessary retail functions.
Cellular South's reputation for good customer service and the uniformity of the customers' experiences in dealing with Cellular South, regardless of whether they contact Cellular South by visiting its stores, calling on the telephone or using the Cellular South website, are critical to Cellular South's ability to maintain and grow its customer base. At the time I made the decision to terminate the use of agents, I believed and still do believe that Cellular South is better able to maintain its overall customer service standards without the use of independent agents.

*1251 To the best of Cellular South's and my knowledge, Dalton's agency was a "successful" agency in terms of sales. However, it was impractical for Cellular South to maintain some agents while terminating others, since the administrative burden of maintaining a few agents would have been very similar to the burden of maintaining them all. For these reasons, I determined that continuation of Cellular South's agency relationships, including Dalton's, would be detrimental to the overall well-being, reputation and goodwill of Cellular South.
As Meena explained in his affidavit, Cellular South allegedly determined that the continuation of any agency relationship was detrimental to Cellular South's business. However, the affidavit contained no facts indicating that Dalton's successful agency had caused harm to either Cellular South's reputation or goodwill. It seems obvious to me that an agency that brought over six thousand customers to Cellular South could hardly be detrimental to either Cellular South's reputation or goodwill.
¶ 23. As stated, the contract gives solely to Cellular South the right to terminate if and when the relationship with Dalton becomes detrimental to Cellular South's well-being, reputation, and goodwill. However, it is important to note that these criteria are written in the conjunctive, not disjunctive. This language indicates to me that while Cellular South is the sole arbiter of whether the agency relationship has become detrimental to its well-being, reputation, and goodwill, that determination cannot be arbitrary and capricious and must be factually undergirded. In other words, since Cellular South at the time of the execution of the contract recognized and agreed that a continuing agency relationship would be of "increasing value to the agent" and, by correlation, of increasing burden, at least financially, to Cellular South, it could not later terminate the relationship simply because an agency had, in fact, become of increased valuethus raising the amount of commissions that Cellular South had to pay to the agent. To allow Cellular South to terminate the contract based on its obligation to pay increasing commissions to a successful agent is to sanction unfair dealings in contractual relations. I am not prepared to put the judicial stamp of approval on such unfair tactics.
¶ 24. In his letter, Meena indicated that Dalton's relationship was being terminated because of the rising costs of maintaining agency relationships. It appears from the record that the most significant cost of Dalton's agency relationship with Cellular South was the large commissions that Cellular South was paying to Dalton. Therefore, I believe that there is a significant question as to whether Cellular South terminated its agreement with Dalton because of a detriment to Cellular South's reputation and goodwill or because of a loss of profits occasioned by Cellular South's contractual obligations to pay higher commissions to Dalton, who had become a successful agent. Taking all the evidence presented in the light most favorable to Dalton, I believe that there are genuine issues of material fact that prevent the entry of summary judgment in this case.
¶ 25. In his reply brief, Dalton claims that "the motivation for his termination was to capture the commissions he was building up in the seven counties assigned to him. To put it more direct [sic], Dalton's termination occurred not because of detriment to the overall well-being, reputation and good will [sic] to Cellular South, but to [sic] its greed." My review of the record leads me to believe that there is a *1252 significant question as to the truthfulness of the reasons presented in Meena's affidavit. The unilateral right given to Cellular South to determine when the agency had become a detriment to Cellular South's well-being, reputation, and goodwill did not encompass or include the right to falsify the facts or the reason for the termination. As stated, since the costs of maintaining Dalton's agency were known and clearly anticipated by Cellular South, a question remains as to whether Cellular South terminated Dalton's relationship merely to avoid paying commissions to him. I would reverse and remand this case for a trial on the merits, especially on the question of whether Cellular South's assertionthat maintaining the agency relation with Dalton would result in a detriment to its reputation and goodwillwas pretextual or factual.
¶ 26. For the reasons presented, I dissent.
LEE, P.J., AND CHANDLER, J., JOIN THIS SEPARATE OPINION.
NOTES
[1] The agreement refers to Cellular South as Cellular Holding.
[2] According to the affidavit of Meena, president of Cellular South, uniformly consistent customer service was "critical to Cellular South's ability to maintain and grow its customer base," and Cellular South was "better able to maintain its overall customer service standards without the use of independent agents."
[3] The agreement refers to Cellular South as Cellular Holding.