Margaret McKee brought this action in the Chancery Court of Coahoma County, *Page 263 
seeking an equitable division of the property and assets of a partnership comprised of her and her brother, John McKee. The chancery court ordered the distribution of the various partnership assets, which Margaret now appeals, alleging as error the following:
 (1) THE TRIAL COURT ERRED BY FAILING TO INTERPRET THE CONTRACT SO AS TO ALLOCATE TO MARGARET MCKEE A "KLONDIKE PLACE" CONTAINING 973 ACRES.
 (2) THE TRIAL COURT ERRED BY FAILING TO AWARD MARGARET MCKEE THE FAIR RENTAL VALUE OF HER ONE-HALF INTEREST IN THE JOINTLY OWNED FARM EQUIPMENT WHICH JOHN MCKEE HAD EMPLOYED FOR HIS OWN PERSONAL USE.
 (3) THE TRIAL COURT ERRED BY REFUSING TO EXERCISE JURISDICTION OVER THE PARTNERSHIP PROPERTIES LOCATED IN THE COUNTRY OF PARAGUAY.
The factual background of this dispute originated when John B. McKee, a Coahoma County farmer, deeded various agricultural properties to his two minor children, John, Jr. and Margaret, in the late 1940's. John, Jr. (hereinafter "John") began managing the resulting partnership, known as "J M McKee", upon his return from military service. John, Sr. died in 1966, and Frances McKee, John and Margaret's mother, died in 1970. At all times thereafter, John managed all of the various estate interests as an equal partnership with Margaret. During this period of time, the parties also equally owned a corporation known as Taylor Gin Company.[1]
Although the majority of the partnership's property and other assets were based in Coahoma County, Mississippi, Margaret lived in Memphis, Tennessee, where she worked as a newspaper journalist. She played no active role in the day to day operations of the partnership, although she received regular reports concerning the parties' interests. She also possessed minimal familiarity with the properties in question, and drew a regular monthly sum from the partnership account, allowing her to share the profits and accumulation in the partners' equity account.
By 1982, the partnership had acquired property and assets not only in Mississippi, but also in South Carolina, Florida, Arkansas, and the country of Paraguay, South America. By mid-1982, the partners were in serious disagreement over the proper management of the partnership, and John informed Margaret that the 1983 crop year would be the last year during which the properties would be operated as a partnership.
By June 1983, the situation had still not improved, and John informed Margaret at that time that the properties would have to be divided by the end of December 1983, because he would not farm them thereafter. The conflict between brother and sister was apparently so intense that all communications from that point forward were to be made through an intermediary, Ed Hamlet, an attorney from Memphis, Tennessee. Hamlet was a college classmate of John McKee's, who in more recent years had served as the attorney for all the partnership and corporate entities, as well as the tax attorney for John and Margaret McKee, individually. This method of communication extended to written materials, as well as telephone inquiries. Not surprisingly, the parties were unable to agree over the proper division of the partnership's property.
On February 10, 1984, in the Chancery Court of Coahoma County, Mississippi, Margaret filed against her brother John a Complaint for Dissolution of Partnerships, Partnership's Accountings, and for a Division of Assets of Partnership, and for a preliminary injunction regarding division of farm equipment. The complaint alleged that during 1983, differences had arisen between the parties concerning the management of the partnership and that they had mutually resolved to terminate the partnerships and dissolve the corporations *Page 264 
following the 1983 crop year and to distribute the assets. The complaint further noted that during late December, 1983, the parties had reached agreement concerning the partial division of certain agricultural real properties which resulted in the execution of documents embodying this agreement on January 9, 1984.
The complaint stated that the parties had been unable to agree to terms of a final accounting and an appropriate partition of other jointly-owned real estate holdings and final distribution of partnership assets, and accordingly, the complaint ultimately sought a proper accounting of all partnership and corporate activities from their inception, a partition of all involved real estate, and distribution of all remaining assets of the partnerships and corporations as dictated by the accounting. The complaint also sought a mandatory injunction, requiring the immediate delivery of half of the partners' jointly-owned farming equipment, so as to enable Margaret to farm her allocable portion of the properties for the 1984 crop year.
In lieu of a hearing, the parties, through their attorneys, met and conferred, and a temporary order was entered on February 17, 1984, setting forth the procedure by which all jointly-owned farm equipment would be inventoried, appraised, and divided, and half of this equipment would be delivered to Margaret. The February 27th order further specifically directed that one "Case 2390 Tractor should not be operated by either party until the appraisal of the particular equipment is finalized."
The trial court entered an order on April 25, 1984, in which it set down for hearing on May 8, 1984, all disputes arising between the parties under the previous orders of the court or under agreements made by the parties, including any remaining property disputes and other issues arising out of the parties' own agreement, dated January 9, 1984. The intent of the trial court was to interpret any and all agreements and to resolve all disputed issues arising therefrom.
At the May 7 and 8, 1984, hearing testimony was taken relative to an interpretation of the parties' January 9th partial division agreement, particularly insofar as it pertained to the "Klondike property" awarded by the agreement to Margaret McKee, the "Chism property" awarded by the agreement to John McKee, and another 9.6-acre portion of Margaret's "Klondike Place" now being claimed by John. On May 8, at the conclusion of a segment of a bifurcated hearing, the trial court, in an oral bench opinion, awarded 60 acres of land referred to in the testimony of John McKee as the "Chism property" and the 9.6 acres of land referred to in John's testimony as the "Compress Site" to John, which Margaret now claims on appeal effectively removed 69.6 acres of real property from her interest in the "Klondike Place."
The hearing then resumed, and the court considered a controversy arising from John's claim that two brand new Case 2390 tractors situated in Friar's Point, Mississippi, had been earmarked by him for future use in the South Carolina farming operation, and accordingly, were to go to him under the terms of the January 9 agreement, which had given him the South Carolina property, plus equipment. As to this point, the court held that the two new tractors in question were not allocable to the South Carolina property, but simply constituted a part of the undivided and jointly-owned equipment of the parties, which was subject to inventory, appraisal, division, and equal distribution, pursuant to the terms of the court's order of February 27, 1984.
The May 8 hearing was then adjourned, with other issues to be dealt with at the time of subsequent hearings. On May 18, 1984, Margaret filed a motion to reconsider the oral bench opinion, insofar as it pertained to the 69.6 acres, and on August 31, 1984, she filed a pre-trial memorandum of authorities going to the question of the Mississippi court's jurisdiction over the partnership's property located in the country of Paraguay.
When Margaret received one of the "new" Case 2390 tractors, she discovered that during the pendency of the litigation over her entitlement to the tractor, John *Page 265 
had utilized the tractor for the farming operations to the extent of some 154 hours. On September 4, 1984, at a subsequent hearing, the court heard testimony concerning Margaret's claim to the fair rental value of all hours put on her 2390 tractor and equipment by John during the pendency of her action to compel the delivery of the tractor and other equipment. The trial court declined to award any rental value to Margaret for the 2390 tractor or for any other equipment.
On October 9, 1985, the Chancery Court of Coahoma County withdrew its previous order of March 7, 1985, and substituted in lieu thereof an order incorporating prior bench opinions and further findings of the court to be dispositive of the issues heard to that point. This order included the award of the 69.6 acres of land which Margaret claimed should be in her "Klondike Place" to John, and the denial of Margaret's claim for fair rental value of her share of the equipment used by John prior to its delivery to her.
Finally, on April 1, 1987, Margaret filed a motion to clarify the court's prior position with respect to the Paraguayan property. In this motion, Margaret alleged that, despite repeated specific prayers for relief in the form of a partition or distribution of all real estate interests jointly-owned by the parties, including the property located in the country of Paraguay, and despite the filing of briefs on this point, the court had never held hearings on the question nor entered any order relative to Paraguayan property. On May 18, 1987, the court, without a hearing, specifically ruled that it lacked jurisdiction over the partnership's jointly-owned real properties in Paraguay and found that such properties must be divided, if at all, either by agreement between the parties or by action instituted in the courts of Paraguay. Margaret then perfected her appeal to this Court.
 I.
DID THE TRIAL COURT ERR BY FAILING TO INTERPRET THE CONTRACT SO AS TO ALLOCATE TO MARGARET MCKEE A "KLONDIKE PLACE" CONTAINING 973 ACRES?[2]
In order to understand the problem confronting the trial court, it is helpful to examine a statement made by the chancellor just before he issued a ruling from the bench:
 I tried to look at this contract as far as I could. I am not being critical of Mr. McKee but in my wildest imagination I can't imagine a worse way to draw a contract between two litigants who do not communicate directly even through one intermediary and then with a layman drawing a contract. Be that as it may, I am going to try to interpret it as best I can from everything that I have heard and what I believe the actual intent of the parties was.
Of this $15,000,000.00 partnership, the parties are disputing approximately $126,000.00. (70 acres [69.6] X $1,800.00/acre). To discuss the case further, a listing of commonly used terms is necessary:
 (1) Klondike Place: A large tract of land which may or may not contain the 69.6 acres at issue. Regardless of where those 70 acres end up, both parties agree that Margaret is entitled to "the Klondike Place." She claims that it should contain 973 acres, while her brother maintains that it comprises 912 acres, more or less. With the 9.6 acres around the Taylor Ginning Company removed, the Klondike Place contains only 903 acres.
 (2) Chism Property: 120 acres of land purchased in 1973 by J M McKee from the M.E. Chism Estate. It is comprised of two (2) separate rectangular tracts of approximately sixty (60) acres each. The particular labels attached to these two *Page 266 
parcels may only charitably be described as confusing, although the two main terms appear to be "Chism purchase" and the "Roper cut." They are at the heart of this particular assignment of error.
 (3) Dunn Cut: A 25 acre tract of land which is mentioned most often in connection with the "Roper cut." It is not part of the disputed area, but it is mentioned several times in the record.
 (4) "The 9.6 Acres": A tract of land which may or may not be part of the Taylor Ginning Company. John claims it is an integral part of the operation of Taylor Ginning Co., and since he received the Company under the property division agreement, he claims that he should receive it as well. Margaret maintains that it should go to her as part of the Klondike Place.
 A. The Chism Purchase/Property
This case is essentially a matter of contract interpretation. One thing on which the parties agree is that John made an original proposal for the division of property in a letter to Ed Hamlet dated October 15, 1983. In the letter he admittedly offered Margaret the "Klondike Place", totaling approximately 973 acres, a portion of which was the disputed 60 (61 in the letter) acres of the Chism purchase. On the next page of the letter, he stated that he would receive "60 acres of the Chism property —Roper Place — and the Dunn Cut, 25 acres." (Emphasis added)[3]. Due to the potentially confusing nature of these various terms, Margaret contended at the hearing that she relied on this particular phraseology for the duration of their negotiations.
It is thus clear that John initially offered Margaret a "Klondike Place" totaling 973 acres, of which 60 acres was the (non-Roper cut) Chism property. On December 30, 1983, Margaret listed her understanding of the property division. In this listing, she received a "Klondike Place" totaling 973 acres. John received a 60 acre tract described as "Roper", with "Chism" handwritten beside the word Roper. The total acreage for Margaret was 3720 gross acres and 3480 cultivatable acres. John's total acreage was 3680 gross acres, and 3440 cultivatable acres. John claimed at the hearing that his original proposal was altered many times and was no longer in effect by the time the "final" agreement was signed by the parties on January 7 and 9. An examination of the document reveals otherwise.
The final signed document signed by both parties, states on page two that Margaret was to receive the identical 3720/3480 ratio of gross to cultivatable acreage mentioned previously, while John was to receive 3680/3440, also as before. Considering the amount of confusion generated by the terminology used to refer to the various tracts, this is one of the few logical pieces of information this Court was able to find in the record or the exhibits. It also purports to be the final agreement of the parties.
Under general principles of contract law, one should look to the "four corners" of a contract whenever possible to determine how to interpret it. Of course, this is possible only when the intent of the parties is "clear or unambiguous." Pursue EnergyCorp. v. Perkins, 558 So.2d 349, 352 (Miss. 1990). The "contract" at issue here cannot be characterized as such. In fact, an examination of various "canons" of contract construction is likewise of little help. Pursue, 558 So.2d at 353. The only remaining step is to consider the "totality of circumstances" surrounding the final contract, which has been done. Id. at 353. The final agreement in the case sub judice makes no sense unless it is examined in conjunction with other correspondence between the parties.
It is the opinion of this Court that a combined reading of the various written correspondence leads to a more internally harmonious result. The chancellor's decision *Page 267 
on this point is manifestly contrary to a total reading of all prior documents, and therefore is reversed, with the disputed 60 acres of the Chism property awarded to Margaret. Under this interpretation, the total number of acres awarded to each party is consistent with all previously agreed-to documents.
 B. The 9.6 Acres
The 9.6 acres in question lies immediately adjacent to the Taylor Ginning Company and has apparently been used for years as a disposal or refuse site for the Company. The parties seem to agree that John is to receive the entity known as "Taylor Ginning Company" pursuant to the terms of the agreement. John maintains that the agreement also encompasses the 9.6 acre adjacent disposal site; Margaret claims it does not.
In the documents transmitted between the parties, the "Taylor Ginning Company" is mentioned many times, but exactly what this means is never made clear. Concerning the 9.6 acres, the chancellor made the following finding:
 As to the 9.6 acres, again interpreting the contract, I must conclude notwithstanding the fact that Taylor Gin Company is a corporation and owned no real estate, I must conclude that it was the intention of the parties in describing Taylor Gin Company that they must have understood that it meant the 9.6 acre dump site adjacent to the Gin.
John testified at the hearing that he believed the Gin Company owned the 9.6 acres in question. Whether this is in fact true, he convincingly described the importance of the 9.6 acres to the ginning operation; Margaret was unable to provide equally convincing proof in support of her contention. Unlike the facts surrounding the Klondike Place/Chism/Roper dispute, the Gin Company was described in only the most general of terms in the correspondence between Margaret and John, and the 9.6 acres was never specifically mentioned at all. Therefore, the chancellor was within his discretion in awarding the 9.6 acre dump site to John. There is no contrary indication from the surrounding documents. There is no merit to this portion of the assignment of error, and the chancellor is affirmed on this point.
 II.
DID THE TRIAL COURT ERR BY FAILING TO AWARD MARGARET MCKEE THE FAIR RENTAL VALUE OF HER ONE-HALF INTEREST IN THE JOINTLY OWNED FARM EQUIPMENT WHICH JOHN MCKEE HAD EMPLOYED FOR HIS OWN PERSONAL USE?
On February 27, 1984, the parties entered into an order in which they agreed that two (2) disputed tractors would not be operated "until the appraisal of this particular equipment is finalized." At the May 8, 1984 hearing, the court held that the tractor (a Case 2390) should be awarded to Margaret.
John testified at the September 4, 1984 hearing that he had never used the tractor between the February 27, 1984 agreed order and the time the appraisal was conducted in April, 1984. No provision was ever made prohibiting John from using the tractor after the appraisal was made, but before delivery to his sister.
When the tractor was delivered to Margaret, it had 154 hours of use on it (instead of being new); uncontradicted testimony at trial indicated that the fair hourly rental value of such a tractor was $24.00 per hour. Margaret now seeks the fair rental value of the tractor for those 154 hours of use. The trial court found no merit to her claim.
In addition to the fact that John was not prohibited from using the tractor following the appraisal, he testified that he had used it to harvest joint crops belonging to the partnership. There is no merit to this claim, and the chancellor is affirmed on this point.
 III.
DID THE TRIAL COURT ERR BY REFUSING TO EXERCISE JURISDICTION OVER THE PARTNERSHIP PROPERTIES LOCATED IN THE COUNTRY OF PARAGUAY?
Under this final assignment of error, Margaret contends that the trial court *Page 268 
erred by refusing to exercise jurisdiction over certain properties located in the country of Paraguay. For two reasons, this Court disagrees.
First, the record in this case makes virtually no reference to the assets and/or property located in Paraguay, making it difficult for us to ascertain with any degree of certainty the true nature of this portion of the dispute. See Kountouris v.Varvaris, 476 So.2d 599, 606 (Miss. 1985) ("[T]he factual record before us is so inadequate that we could not decide the issue with confidence even if we were disposed to do so.")
Secondly, the issue here is property located in a foreign country, a subject which was also addressed in Kountouris,supra. Kountouris centered around the ownership of a piece of property located on the Greek island of Patmos. In that case, we noted the potential unenforceability of any decision made by this Court concerning the merits of the case. 476 So.2d at 608. The same is true here. Therefore, we affirm the chancellor's holding on this point without prejudice to either party. No final adjudication of this issue was made by the trial court; we likewise decline to do so.
 IV.
For the foregoing reasons, it is the holding of this Court that the decision of the trial court is reversed as to the award of the 60 acre Chism property to John McKee, and affirmed in all other respects.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART AS TO THE 60 ACRE TRACT; AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
DAN M. LEE, P.J., dissents without written opinion.
[1] This corporation was an active cotton ginning operation which owned a metal building containing ginning equipment, various vehicles, and a Hawker aircraft.
[2] Margaret lists as a separate assignment of error the admission into evidence of a "self-serving" document prepared by John which relates to the Klondike Place issue. The document lists various property values which Margaret maintains are incorrect. Her counsel objected to its introduction, but was overruled by the trial court. The document is admissible under Rules 402, 601, and 612 of the Rules of Evidence. Margaret's counsel was given the opportunity to cross-examine John about its validity, and the entire document is contained in the record.
[3] In reading this lengthy proposal, one should keep in mind that the only narrow issues presented here are: (1) which party should get the 60 undisputed acres of the Chism property, and (2) which party should get the 9.6 unnamed acres near the Ginning Company.