MYERS, P.J.,
 

 for the Court.
 

 ¶ 1. James Lee (Lee) and his wife Marsha brought suit in the Chancery Court of Lamar County against the South Mississippi Electric Power Association (SME-PA), alleging that SMEPA had triggered a reverter clause in a right-of-way instrument that provided for the placement of power lines on the Lees’ property. The reverter clause provided that the easement would terminate if the lines were continuously “inoperative” for a period of one year. Upon learning that the lines had been de-energized for approximately twelve years, the Lees sought to remove the cloud from the title and asked the court for injunctive relief requiring SME-PA to remove its lines from their property. The chancellor denied relief. Finding that the chancellor erred, we reverse and render.
 

 FACTS
 

 ¶ 2. Lee granted SMEPA a right-of-way easement across a portion of his real property, through a “Right-of-Way Instrument” filed with the Chancery Clerk of Lamar County on February 20, 1980. The instrument granted SMEPA “the right to construct, maintain!,] and operate electric lines and all telegraph and telephone lines, towers, poles, appliances, and equipment necessary or convenient in connection therewith, and counter[-]poise wire or other counter-poise conductors.... ” It also contained a reverter clause, which read:
 

 The rights herein granted shall cease and revert to the grantors ... upon the expiration of any period of one year occurring after the date the line has been completed and put into operation during which said strip shall remain free of or from such poles, towers, appliances, wires, anchors!,] and guy wires, or during which such poles, towers, appliances, wires, anchors!,] and guy wires shall have remained continuously inoperative.
 

 
 *599
 
 Testimony indicated that the above clause was drafted by SMEPA at Lee’s request and that such clauses were not ordinarily part of SMEPA’s right-of-way instruments.
 

 ¶ 3. The Lees brought suit against SME-PA, seeking to enforce the reverter clause. At trial, the parties stipulated that this provision was a valid reversionary clause. The parties likewise stipulated that the lines running across the Lees’ property had been physically disconnected at both ends and de-energized for a period of more than ten years.
 
 [1]
 
 Lee testified that he believed the lines on his property had been “inoperative” since being de-energized, and he essentially rested on the stipulations.
 

 ¶4. SMEPA called two witnesses, who were electrical engineers and SMEPA employees, who testified that the lines placed on the Lees’ property are part of a greater line, designated Line 91. Line 91 had been continuously de-energized for approximately twelve years. It had, however, been maintained in the same manner as energized lines. Since Line 91 was de-energized, SPEMA had spent $22,000 maintaining it.
 

 ¶ 5. SMEPA’s witnesses also testified that, although Line 91 had been de-ener-gized and disconnected, it was the sole backup for the Oak Grove Substation, which served 3,500 end users. Line 91 had been maintained “so that should the need arise in an emergency” SMEPA could provide power to those customers.
 
 [2]
 
 Line 91 could be reconnected and a mobile transformer brought into the Oak Grove Substation, re-energizing Line 91 “in a matter of hours.” Furthermore, twenty out of the twenty-three SMEPA substations in the region had similar backup lines; the three that did not served peripheral, rural customers.
 
 [3]
 
 Each witness also testified that, in his opinion, Line 91 was not rendered inoperative because it was de-energized and disconnected.
 

 ¶ 6. The chancellor favored the interpretation offered by SMEPA, holding that the interpretation offered by the Lees would result in a forfeiture. The chancellor found that because Line 91 had been maintained and “would function properly, should [it] be needed in the future,” SME-PA was in substantial compliance with the reverter clause. The chancellor therefore denied the relief requested by the Lees.
 

 STANDARD OF REVIEW
 

 ¶ 7. In reviewing the judgment of a chancery court, an appellate court “will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, applied an erroneous legal standard, was manifestly wrong, or was clearly erroneous.”
 
 Hamilton v. Hopkins,
 
 834 So.2d 695, 699 (¶ 12) (Miss.2003) (citations omitted). Additionally, where the chancellor has made no specific findings, we will proceed on the assumption that he resolved all such fact issues in favor of the appellee.
 
 Newsom v. Newsom,
 
 557 So.2d 511, 514
 
 *600
 
 (Miss.1990). A chancellor’s interpretation and application of the law, however, is reviewed de novo.
 
 Tucker v. Prisock,
 
 791 So.2d 190, 192 (¶ 10) (Miss.2001).
 

 ¶ 8. The initial question of whether ambiguity exists within an instrument is one of law.
 
 McDonald v. Miss. Power Co.,
 
 732 So.2d 893, 898(¶ 14) (Miss.1999). “Where a contract is to be construed by its terms alone, it is the duty of the court to interpret it; but where its meaning is obscure, and its construction depends upon other and extrinsic facts in connection with what is written [it presents a question of fact].”
 
 Baylot v. Habeeb,
 
 245 Miss. 439, 447, 147 So.2d 490, 494 (1962); see
 
 also Lamb Constr. Co. v. Town of Renova,
 
 573 So.2d 1378, 1383 (Miss.1990) (“[T]he interpretation of an ambiguous writing by resort to extrinsic evidence presents a question of fact.” (quoting
 
 Kight v. Sheppard Bldg. Supply,
 
 537 So.2d 1355, 1358 (Miss.1989))). Such findings of fact are “reviewed under the familiar substantial evidence/manifest error standard.”
 
 Id.
 
 (citing
 
 Bryant v. Cameron,
 
 473 So.2d 174, 179 (Miss.1985)).
 

 DISCUSSION
 

 ¶ 9. The material facts are essentially undisputed: the lines on the Lees’ property have been disconnected and de-ener-gized for twelve years, and the right-of-way instrument contains a valid reverter clause, which is triggered if the lines on the Lees’ property are “continuously inoperative” for a period of at least one year. At issue is only the meaning of the word “inoperative.”
 

 ¶ 10. We have stated:
 

 In construing the language of an easement, the rules for the interpretation of deeds and other written instruments apply.
 
 Hobgood v. Koch Pipeline Southeast, Inc.,
 
 769 So.2d 838, 843(¶ 24) (Miss.Ct.App.2000). An instrument that is clear, definite, explicit, harmonious in all its provisions and free from ambiguity must be given effect.
 
 Id.
 
 (citing
 
 Pursue Energy Corp. v. Perkins,
 
 558 So.2d 349, 352 (Miss.1990)). The courts rely on the “four corners doctrine,” under which “an instrument is considered as a whole, in order to ascertain the intention of the parties.”
 
 Id.
 

 Crawford v. Butler,
 
 924 So.2d 569, 574(¶ 14) (Miss.Ct.App.2005).
 

 ¶ 11. The supreme court has outlined a three-tiered approach to contract interpretation, stating: “In reviewing [a] document, the court should construe the language in a manner which makes sense to an intelligent layman familiar only with the basics of [the] English language.” Warren
 
 v. Derivaux,
 
 996 So.2d 729, 735(¶ 12) (Miss.2008) (citations and internal quotations omitted). If we find ambiguity that cannot be resolved by the four corners of the document, we next resort to the discretionary application of the canons of construction; and if the ambiguity cannot there be resolved, we may look to parol and other extrinsic evidence.
 
 Perkins,
 
 558 So.2d at 352-53. The supreme court noted, however, that “the so-called three-tiered process is not recognized as a rigid ‘step-by-step’ process. Indeed, overlapping of steps is not inconceivable.”
 
 Id.
 
 at 351 n. 6.
 

 ¶ 12. As the facts here are essentially undisputed, construction of the instrument is determinative. If the lines were rendered “inoperative” after being disconnected and de-energized, we must find for the Lees; if not inoperative, for SMEPA. The parties also agree somewhat on the meaning of the word, offering numerous variations of “not operating,” “not functioning,” or “not working.” SMEPA, however, essentially argues that in this context it is limited to “not (capable
 
 *601
 
 of) operating” as a result of damage or neglect, while the Lees argue that inoperative includes “not (actually) operating.” The issue, therefore, is whether the parties intended “inoperative” to be limited to damaged or neglected lines.
 

 ¶ 13. While inoperative is most often defined simply as “not operating,” it may communicate a more limited meaning depending on what it describes. In some contexts, it would be understood to describe something that is inoperable, rather than simply idle. For example, an “inoperative vehicle” would be understood to refer to one that is incapable of operation. Even if we were to find that this is the common or ordinary understanding of an “inoperative” electrical transmission line, the usage is nonetheless not so limited to damage or neglect as SMEPA’s argument requires. A vehicle could be described as inoperative notwithstanding that it had been deliberately disabled or that it was otherwise maintained in working order. Here, SMEPA stipulated that the lines were physically disconnected at both ends, and testimony indicated that the transformer required to put the line into operation had been removed from the Oak Grove Substation.
 

 ¶ 14. The four corners of the document also undermine SMEPA’s argument that maintenance of the lines prevented them from becoming “inoperative.” The instrument distinguishes between SMEPA’s rights to “construct, maintain[,] and operate” the lines located on the property, and the reverter clause does not take effect until the lines are “completed and put into operation.” Furthermore, the reverter clause would be triggered if the lines were physically removed from the Lees’ property, even if SMEPA intended to preserve the right-of-way as a backup.
 

 ¶ 15. Our application of the canons of construction resolves any remaining doubt. “Where terms of a contract are vague or ambiguous, they are always construed most strongly against the party who drew it.”
 
 Crum v. Butler,
 
 601 So.2d 834, 839 (Miss.1992) (citations omitted). While we recognize that forfeitures are not favored by the law, the record reflects that the reverter clause was inserted at Lee’s specific request. However, it was drafted by SMEPA. SMEPA, as a power association, was more familiar with the subject matter and its own potential future uses of the easement. If it had intended to limit the meaning of “inoperative” as it argues, SMEPA should have done so when drafting the easement.
 

 ¶ 16. Finally, we find that little extrinsic evidence bearing on the issue was offered by either party.
 
 [4]
 
 We therefore conclude that the chancellor erred as a matter of law in construing the reverter clause as SMEPA has argued.
 

 ¶ 17. The parties stipulated that the lines on the Lees’ property were disconnected and de-energized for a period of more than one year. Because this rendered the lines “continuously inoperative,” the chancellor erred in denying the Lees’ petition. Accordingly, we reverse and render judgment in favor of the Lees as to title to the property and injunctive relief.
 
 [5]
 

 
 *602
 
 ¶ 18. THE JUDGMENT OF THE CHANCERY COURT OF LAMAR COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
 

 [1]
 

 . Testimony at trial established that the ''ends” referred to in the stipulation were not located on or abutting the Lees' property. Instead, these were the ends of Line 91, of which the lines on the Lees’ property were a continuous part.
 

 [2]
 

 . SMEPA’s witnesses testified that Line 91 had been de-energized because the Oak Grove Substation was now powered by a line provided by the Mississippi Power Company (MPC). Line 91 might be required again if MPC ceased providing the electricity for the substation or if the transformer required to receive power from MPC’s line were to fail.
 

 [3]
 

 .Some backup lines were configured to be energized “at the flip of a switch,” but it is unclear from the record what percentage of tire lines these represented.
 

 [4]
 

 . A review of the record and the chancellor's memorandum opinion reveals that the chancellor did not base his interpretation of the deed on extrinsic evidence. While he did discuss SMEPA's maintenance of the lines, the chancellor did not consider it as extrinsic evidence of the parties' intent; instead, it was evidence only that SMEPA had not triggered the reverter clause. Neither of SMEPA's witnesses testified that the instrument at issue had any bearing on SMEPA's subsequent decisions. In fact, little extrinsic or parol evidence of the parties' intent was offered by either side.
 

 [5]
 

 . Our decision should not be read, however, to preclude or bear upon any future condem
 
 *602
 
 nation action against the Lees' property, should SMEPA pursue it.