# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00507-COA

**BONNIE JEAN (HUDSON) PAGE**                                    **APPELLANT**

**v.**

**WILLIAM LEWIS HUDSON, SR.**                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/24/2015 |
| TRIAL JUDGE: | HON. LAWRENCE PRIMEAUX |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM B. JACOB |
| | JOSEPH A. KIERONSKI JR. |
| | DANIEL P. SELF JR. |
| ATTORNEYS FOR APPELLEE: | KACEY GUY BAILEY |
| | JUSTIN MILLER COBB |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | RETIREMENT BENEFITS AWARDED TO APPELLEE |
| DISPOSITION: | AFFIRMED - 03/08/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., CARLTON AND JAMES, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1. This appeal arises from a final judgment of the Lauderdale Chancery Court granting summary judgment in favor of William Hudson. The chancellor determined that William's ex-wife, Bonnie Page, was not entitled to receive certain retirement benefits resulting from William's retirement. Bonnie now appeals, asserting the following assignments of error: (1) the chancellor applied an erroneous standard of law to contract construction; and (2) the chancellor failed to understand the multiple components of William's retirement as applied

to the clear and unambiguous language of the property-settlement agreement. Finding no error, we affirm.

## FACTS

¶2. Bonnie and William were married on July 6, 1970. William started working with the Norfolk Southern Railroad (the "Railroad") in 1972. The parties divorced on May 17, 1991. At the time of their irreconcilable-differences divorce, the parties addressed William's retirement from the Railroad in their property-settlement agreement ("Agreement").[1] The parties agreed to the following specific language:

> It is understood and agreed that during the period of this marriage, [William] has been employed with the Norfork Southern Railroad. That as a result of his employment, he has built up substantial retirement at said railroad company. This retirement is handled through the Railroad Retirement Board. It is further understood and agreed that on occasion the railroad company will offer to allow the employee to retire early with a payoff on his retirement plan. It is understood and agreed that [Bonnie] shall be the owner of all of the above described retirement as she will otherwise be entitled as a result of being married and divorced from an employee of the railroad.
>
> . . . .
>
> [William] agrees that he will not take any early retirement if such retirement will result in a cash payoff of his regular retirement and will affect the rights of [Bonnie] to any retirement payments as described above."

¶3. William retired from the Railroad in 2010. Upon his retirement, William commenced receiving Railroad retirement benefits pursuant to the Tier I component, which is the Railroad equivalent of Social Security. He also began receiving a Tier II Annuity and a Supplemental Annuity. His monthly benefits at the time totaled $3,219.21.

---

[1] The Agreement was incorporated into the parties' May 17, 1991 judgment of divorce.

¶4.     When Bonnie turned sixty-two years old in July 2013, she applied for and received a Divorced Spouse Annuity through William's Railroad retirement in the amount of $760.50 per month. However, Bonnie failed to receive any of William's Tier II or Supplemental Annuity benefits. As a result, Bonnie filed a complaint for citation of contempt and related relief on May 7, 2014, alleging that William refused to cooperate in executing a qualified domestic relations order ("QDRO") and was preventing Bonnie from receiving certain Railroad retirement benefits earned by William.

¶5.     William filed his answer, denying that Bonnie should receive any retirement benefits. William also filed a motion for a declaratory judgment and related relief, seeking an adjudication that: Bonnie is receiving all of the retirement benefits provided for in the Agreement; William is not in contempt of the Agreement, and Bonnie is not entitled to modification or amendment of the divorce judgment; William is owner of his Tier I, Tier II, and Supplemental Annuity benefits through the Railroad Retirement Board; Bonnie is not entitled to a QDRO; and she is not entitled to any benefits other than those she is receiving now.

¶6.     Bonnie filed a motion for partial summary judgment regarding her entitlement to the retirement pursuant to the Agreement. William then filed a motion for summary judgment, reiterating that since the Agreement did not contain the language "Tier II or Supplemental Annuity," any retirement benefit William received from those two components belonged to William alone.

¶7.     After a hearing on the matter, the chancellor entered a final judgment finding that

3

since Bonnie was currently receiving benefits through Tier I, she was entitled to nothing from William's Tier II or Supplemental Annuity benefits. In the judgment, the chancellor explained the difference in Tier I, Tier II, and Supplemental Annuity benefits and made the following findings:

> Tier I can best be understood as the equivalent of Social Security benefits, and follows many of the rules of Social Security. As the explanatory material states with respect to a divorced . . . spouse of a railroad retiree:
>
>> The divorced spouse of a railroad employee may become entitled to a benefit under the Railroad Retirement Act if the parties were married at least 10 years and if the divorced spouse meets the other conditions of entitlement under Federal law. A divorced spouse benefit is paid from the railroad retirement trust funds and does not reduce the amount of the employee's benefits. Payment of this benefit is controlled by Federal law and cannot be altered by state court order . . . .
>
> In this particular case, the court finds that Bonnie and William had been married at least 10 years before the divorce, and that she was entitled by law to Tier I benefits that could not be altered or eliminated by state court order. The benefit paid to Bonnie under Tier I is referred to as the "Divorced Spouse Annuity[.]"
>
> Tier II benefits are based on railroad industry service and earnings, and are in the nature of a pension. The manner in which Tier II benefits are calculated is dictated by Section 3(b) of the federal Railroad Retirement Act. The [Railroad Retirement Board] takes the position that Tier II benefits are subject to division by state court order in a divorce action, which means that, in a divorce agreement, the parties may agree to division of Tier II and the [Railroad Retirement Board] will honor the agreement, or, in a contested case, the court may adjudicate an equitable division, and the [Railroad Retirement Board] will effectuate it. *For a divorcing spouse to receive Tier II benefits requires either an agreement of the parties to that effect, or an adjudication by the court for equitable distribution in a contested case.* The Supplemental Annuity may be paid to an employee who has completed 25 years of service and had railroad service before 1981. The amount is between $23 and $43 per month. It is divisible by state court order as is Tier II.

(Emphasis added).

¶8. The chancellor interpreted the language in the Agreement stating that Bonnie "shall be the owner of all of the above described retirement as she will otherwise be entitled as a result of being married and divorced from an employee of the [R]ailroad" as referring solely to the Tier I benefits to which Bonnie was entitled as a result of being married to William. The chancellor explained that

> the term "entitled" connotes a legal right or claim that is conferred by law and is enforceable regardless whether there is an agreement or whether the other party objects. The term "entitled" in this case could only refer to Tier I because Bonnie is not entitled to Tier II or Supplemental Annuity benefits absent an agreement or adjudication in a contested case. She has no legal right or claim conferred by law to Tier II or Supplemental Annuity benefits. Bonnie was eligible to become entitled to a division of Tier II and Supplemental Annuity benefits, but only by agreement or adjudication of the court in a contested case. In the absence of an entitlement, she has no claim to the Tier II or Supplemental Annuity benefits.

¶9. The chancellor ultimately concluded that no genuine issue of material fact existed, and as a result, held that William "is entitled to a declaratory judgment as a matter of law, adjudicating that he is the owner of all of his Tier II and Supplemental Annuity benefits derived from his railroad employment, to the exclusion of Bonnie's claim." The chancellor also dismissed the complaint for citation of contempt as well as Bonnie's motion for partial summary judgment. Bonnie now appeals.

**STANDARD OF REVIEW**

¶10. This Court applies a de novo standard when reviewing the grant or denial of summary judgment. *Cypress Springs LLC v. Charles Donald Pulpwood Inc.*, 161 So. 3d 1100, 1103 (¶8) (Miss. Ct. App. 2015). Summary judgment "shall be rendered . . . if the pleadings,

5

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). In so doing, we view the "evidence in the light most favorable to the party against whom the motion has been made." *Cypress Springs*, 161 So. 3d at 1103 (¶8).

¶11. Additionally, "questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact-finder[,]" and we review questions of law de novo. *Id*.

## DISCUSSION

### I. Erroneous Standard of Law

¶12. Bonnie argues that the chancellor applied an erroneous standard of law to contract construction. Specifically, Bonnie claims that the chancellor erroneously applied the legal authorities cited in his final judgment by "mixing and matching" concepts of law dealing with "ambiguous contracts" and applying those concepts to the contract he had previously deemed "unambiguous." Bonnie argues that as a result, the chancellor "rewrote" the Agreement by inserting nomenclature that was nowhere to be found in the original Agreement.

¶13. Property-settlement agreements incident to divorce are contracts. *West v. West*, 891 So. 2d 203, 210 (¶13) (Miss. 2004). As stated, when reviewing questions of contract construction, this Court utilities a de novo standard. *Epperson v. SOUTHBank*, 93 So. 3d 10, 16 (¶17) (Miss. 2012) (citing *A&F Props. LLC v. Madison Cty. Bd. of Sup'rs*, 933 So. 2d 296, 301 (Miss. 2006)).

6

¶14.    Our supreme court has set forth a three-step analysis for the judicial review and interpretation of a contract:

> First, we must determine whether the contract is ambiguous, and if it is not, then it must be enforced as written. In making that determination, the Court must review the express wording of the contract as a whole.  If the contract is unambiguous, the intention of the contracting parties should be gleaned solely from the wording of the contract and parol[] evidence should not be considered.  This Court must accept the plain meaning of a contract as the intent of the parties where no ambiguity exists.  An instrument that is clear, definite, explicit, harmonious in all its provisions, and . . . free from ambiguity will be enforced.

> Where the contract is unambiguous, the parties are bound by the language of the instrument.  Courts should not alter the terms of a valid contract . . . .

> Second, if the Court is unable to ascertain the meaning of the contract and the intent of the parties within the four corners of the contract, we will apply the canons of contract construction.  Where the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party.  Third, if the meaning of the contract is still ambiguous, only then is extrinsic evidence considered.  It is only when the review of a contract reaches this point that prior negotiation, agreements, and conversations might be considered in determining the parties' intentions in the construction of the contract.  The parol evidence rule provides that where a document is incomplete parol evidence is admissible to explain the terms but, in no event, to contradict them.

*Epperson*, 93 So. 3d at 16-18 (¶¶17-19) (internal citations and quotation marks omitted); *see also Royer Homes of Miss. Inc. v. Chandeleur Homes Inc*., 857 So. 2d 748, 752-53 (¶¶10-11) (Miss. 2003).

¶15.    The supreme court also instructed that

> [i]n a summary judgment case, the reviewing Court need not go through the entire three-step analysis; the Court should determine only whether the contract is ambiguous.  Questions of contract construction and ambiguity are questions of law that are committed to the court rather than questions of fact

committed to the fact[-]finder.

*Epperson,* 93 So. 3d at 18 (¶20) (internal quotation marks omitted). After its review, if the court finds the contract terms "to be ambiguous or subject to more than one interpretation, the case must be submitted to the trier of fact, and summary judgment is not appropriate." *Id.; see also Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 354 (Miss. 1990).

¶16.     In his final judgment, the chancellor here similarly set forth the law regarding contract interpretation, providing:

> Mississippi law has long recognized that property settlement agreements incident to a divorce are enforceable contracts. *See West v. West*, 891 So. 2d [203,] 210 [(¶13)] (Miss. 2004). When called upon to examine a contract, a court must first look at the four corners of the document. *McKee v. McKee*, 568 So. 2d 262, 266 (Miss. 1990). If the language is clear and unambiguous, the intent of the contract must be enforced. *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990). Any uncertainties in the meaning of the contract language are resolved against the party who prepared the instrument. *In re Dissolution of the Marriage of Wood*, 35 So. 3d 507[, 513 (¶11)] (Miss. 2010); *Clark v. Carter*, 351 So. 2d 1333 (Miss. 1977). In absence of strong evidence of the parties' intent, this canon of construction may control. *See Lee v. So. Miss. Elec. Power Assoc.*, 17 So. 3d 597, 601 [(¶15)] (Miss. Ct. App. 2009). The documents reflect that both parties have received cost-of-living increases in their benefits from time to time. If, after considering the four corners of the document, and after applying a meaning more favorable to the non-drafting party, the court determines that the language is ambiguous, only . . . then can extraneous evidence of its meaning be considered. *Harris v. Harris*, 9[8]8 So. 2d 376, 378-379 [(¶10)] (Miss. 2008). The fact that the parties disagree as to the meaning of the contract language does not make the contract ambiguous as a matter of law. *Ivison v. Ivison*, 762 So. 2d 329, 335 [(¶16)] (Miss. 2000). The court must apply an objective standard, not either party's subjective intent or belief. *Palmere v. Curtis*, 789 So. 2d 126, 131 [(¶10)] (Miss. Ct. App. 2001).

¶17.     Bonnie argues that although the chancellor cited to many cases when setting forth the principles of contract interpretation, the chancellor failed to consider the context in which

8

the principles were applied. Bonnie claims that although the chancellor cited to *West*, 891 So. 2d at 210 (¶13), the chancellor then failed to utilize the three-tier approach set forth in *West*. Bonnie maintains that despite the chancellor beginning his analysis by stating "the language is clear and unambiguous," he then concluded his analysis by erroneously going outside "the four corners of the document" and delving into "the intent of the parties," despite the guidance set forth in *McKee,* 568 So. 2d at 266, which provides: "[O]ne should look to the 'four corners' of a contract whenever possible to determine how to interpret it. Of course, this is possible only when the intent of the parties is 'clear or unambiguous.'" Bonnie also submits that the chancellor erroneously relied on *Wood*, 35 So. 3d at 513 (¶11), which the chancellor cited for the proposition that "any uncertainties in the meaning of the contract language are resolved against the party who prepared the instrument." Bonnie states that after the trial court in *Wood* determined that an ambiguity existed in the property-settlement agreement, the trial court looked to the four corners of the agreement to determine the true intent of the parties. Bonnie argues that the chancellor here found the Agreement "clear and unambiguous," but then erroneously utilized the canons of contract construction, which are only used when there is a finding of ambiguity.

¶18. As stated, the supreme court has instructed that upon review of a summary-judgment case, this Court need not go through the three-step analysis for contract interpretation; rather, we must only determine whether the contract is ambiguous. *Epperson*, 93 So. 3d at 18 (¶20). In his final judgment, the chancellor here stated, "In the case at hand, the language is clear and unambiguous as a matter of law," but also acknowledged that "[t]here remains to be

9

determined, however, what it is that the language means." In *Epperson*, supreme court clarified that "[t]he mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Id*.

¶19. In determining the meaning of the provision of the Agreement here regarding retirement benefits, the chancellor "considered the parties' respective motions and the documentation submitted with them, as well as the filings among the pleadings and the discovery," and found that "the language 'as she will be otherwise entitled as a result of being married and divorced from an employee of the [R]ailroad' refers solely to the Tier I benefits that she was entitled to as a result of being married to William." The chancellor explained that "Bonnie is not entitled to Tier II or Supplemental Annuity benefits absent an agreement or adjudication in a contested case." The chancellor also examined the Agreement for language "that would support a conclusion that Tier II and Supplemental Annuity benefits were included," and determined that the Agreement contained "no mention of Tier II benefits or Supplemental Annuity." The chancellor held that "the omission of language referring to Tier II and Supplemental Annuity is evidence that the parties did not intend to divide either the Tier II or Supplemental Annuity benefits."

¶20. Our review reveals that the chancellor properly examined the Agreement to determine whether or not it was ambiguous. Upon his finding that the Agreement was clear and unambiguous, the chancellor turned next to determine the meaning of the language in the provision regarding William's retirement. As stated, "[t]he mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a

10

matter of law." *Epperson*, 93 So. 3d at 18 (¶20). Viewing the evidence in the light most favorable to Bonnie, we find nothing in the record to substantiate Bonnie's claim that the chancellor applied an erroneous legal standard or "rewrote" the Agreement. As a result, we affirm the chancellor's judgment.

## II.     Railroad Retirement

¶21.    Bonnie next argues that the chancellor erred in determining that she was not entitled to William's Tier II and Supplemental Annuity retirement benefits. She maintains that the chancellor's ruling that she is only entitled to William's Tier I retirement benefits is totally incongruent with the clear and unambiguous language of the Agreement.

¶22.    The Railroad Retirement Act provides

> two tiers of benefits. [Tier II], like a private pension, is tied to earnings and career service. An employee, to be eligible for benefits, must work in the industry 10 years. Absent disability, no benefit is paid, however, until the employee either reaches age 62 or is at least 60 years old and has completed 30 years of service. . . . [Benefits under Tier I] correspond[] exactly to those an employee would expect to receive were he covered by the Social Security Act.

*Hisquierdo v. Hisquierdo*, 439 U.S. 572, 574-75 (1979); *see also* 45 U.S.C. § 231(a) (2012); 20 C.F.R. § 228.2. An employee who works twenty-five years and who has worked before October 1981 may also receive a supplemental annuity. *See* 45 U.S.C. § 231(a)-(b) (2012).

¶23.    The record reflects that Bonnie has been receiving Divorced Spouse Annuity benefits since 2013. However, in order to receive benefits in addition to the Divorced Spouse Annuity, the Railroad Retirement Board has placed certain restrictions on divorcing parties and the courts for the conveyances or awards of benefits. The Railroad Retirement Act

11

states:

> The Board will honor a court decree or a property settlement which meets the following criteria:
>
> > (1) The court decree or property settlement must provide that the spouse or former spouse is awarded payments from railroad retirement annuities payable to the railroad employee.
> >
> > (2) The court decree or property settlement must specify an amount to be paid to the spouse or former spouse.
> >
> > (3) The court decree or property settlement must obligate the Board to make payments directly to the spouse or former spouse.
> >
> > (4) The court decree or property settlement must clearly identify both the employee and the spouse or former spouse to whom payments are to be made.
> >
> > (5) The court decree or property settlement submitted to the Board must be a recently certified copy of the document filed with the court. Where the award is made in an order modifying and earlier court decree, copies of both the original decree and the subsequent order must be furnished. In the case of a court-approved property settlement, both the settlement and any decree or order incorporating or approving the settlement must be provided.

20 C.F.R. § 295.3.

¶24.    William argues that the Agreement does not confer, grant, or award William's Tier II or Supplemental Annuity benefits to Bonnie.  William acknowledges that these benefits were eligible for division in a property-settlement agreement or by court order; however, they were not specified in the Agreement or judgment of divorce as required by federal law. Furthermore, neither document contained a description on how these benefits would be divided.

¶25.    In this case, the record indeed reflects that neither the judgment of divorce nor the Agreement contains a description of or reference to Tier II or Supplement Annuity benefits. Neither document references the Railroad Retirement Board or directs the Board to make Tier II or Supplemental Annuity payments to Bonnie.  As a result, we find that the Agreement at issue fails to meet the requirements mandated by the Railroad Retirement Act in order for Bonnie to receive William's Tier II or Supplemental Annuity benefits.  *See* 20 C.F.R. § 295.3.  Accordingly, we find no error in the chancellor's determination that Bonnie failed to show that a genuine issue of material fact existed as to whether she is entitled to William's Tier II or Supplemental Annuity retirement benefits.  We therefore affirm the chancellor's judgment.

¶26.    **THE JUDGMENT OF THE LAUDERDALE COUNTY CHANCERY COURT IS AFFIRMED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR AND WILSON, JJ., CONCUR.  JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., NOT PARTICIPATING.**